MICHAEL J. KHOURI [SBN 97654]
KHOURI LAW FIRM
4040 Barranca Parkway, Suite 280
Irvine, California 92604
Telephone:   (949) 336-2433
Fax:         (949) 387-0044
Email:  mkhouri@khourilaw.com

Attorney for Movants, TODD TUCKER, et al.

2014 NOV 10  PM 1:34

FILED

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

SACV14-01795 DOC (DFMx)

| In the Matter of the Seizure of: | |
|---|---|
| All funds in Golden State Bank, Account Number 2202059 | SA14-MJ-377 |
| All funds in Golden State Bank, Account Number 2002905 | SA14-MJ-378 |
| All funds in Golden State Bank, Account Number 2204899 | SA14-MJ-379 |
| All funds in Golden State Bank, Account Number 2204725 | SA14-MJ-380 |
| All funds in Bank of America, Account Number 000984502354 | SA14-MJ-381 |
| 2013 Nissan, California License Plate 7CTU314 | SA14-MJ-389 |
| 2012 Chevrolet, California License Plate 6ZOW578 | SA14-MJ-385 |
| 2010 Mercedes, California License Plate 7BRT530 | SA14-MJ-387 |
| 2007 Toyota, California License Plate 5XAR336 | SA14-MJ-388 |
| 2005 BMW, California License Plate 6VMF643 | SA14-MJ-390 |

1

| | |
|---|---|
| TODD TUCKER, et al., Dawn Tucker;<br>CAIR Medical, Inc., Rehab Fitness,<br>Inc.; and<br>A to Z Solutions<br>Movants,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Respondent. | CASE NO. CV _____<br><br>NOTICE OF MOTION AND<br>MOTION FOR RETURN OF<br>PROPERTY; MEMORANDUM OF<br>POINTS & AUTHORITIES;<br>DECLARATIONS OF TODD AND<br>DAWN TUCKER; AND EXHIBITS<br><br>Date:  December 16, 2014<br>Time:  10:00 am<br>Place:  Courtroom to be determined |

PLEASE TAKE NOTICE that on December 16, 2014, at 10:00 am, in a courtroom to be determined at the United States District Court for the Central District of California located at 411 West Fourth Street, Santa Ana, CA 92701, Movants (collectively: Todd and Dawn Tucker, CAIR Medical, Inc., Rehab Fitness, Inc., and A to Z Solutions) will move this Court pursuant to 18 U.S.C. § 981(b)(3) for the release and return of the funds and property seized in the above-referenced seizure warrants.  The Movants respectfully request the release and return of this property for the reasons set forth in the attached Memorandum of Points and Authorities.

This motion is based on 18 U.S.C. § 981(b)(3), on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the Declarations of Todd and Dawn Tucker, supporting Exhibits, and on such further evidence and argument as may be presented at or before the hearing on this motion.

Dated: November 6, 2014

Respectfully Submitted,

KHOURI LAW FIRM

By:  *Michael J Khouri*
     MICHAEL J. KHOURI
     Attorney for Movants,
     TODD TUCKER, et al.

2

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.  Introduction

The Movants respectfully move this Court to order the return of the funds and property seized by Seizure Warrant Case Numbers: SA14-MJ-377, SA14-MJ-378, SA14-MJ-379, SA14-MJ-380, SA14-MJ-381, SA14-MJ-385, SA14-MJ-387, SA14-MJ-388, SA14-MJ-389, and SA14-MJ-390.  This motion is made pursuant to 18 U.S.C. § 981(b)(3).

Todd Tucker ("Mr. Tucker") is the President of CAIR Medical, Inc., the name on the account listed in Seizure Warrant Case Number SA14-MJ-377.  Mr. Tucker is also the President of Rehab Fitness, Inc. d.b.a. Citizen Crossfit, the name on the account listed in Seizure Warrant Case Number SA14-MJ-379.  Dawn Tucker is the President of A to Z Solutions, the name on the account listed in Seizure Warrant Case Number SA14-MJ-380.  Mr. Tucker is the owner of the accounts named in Seizure Warrant Case Numbers SA14-MJ-378 and SA14-MJ-381.  Mr. Tucker is also the registered owner of all the motor vehicles named in Seizure Warrant Case Numbers: SA14-MJ-389, SA14-MJ-385, SA14-387, SA14-MJ-388M, and SA14-MJ-390.  As such, the Movants have standing to file this motion regarding the above-referenced seized property.

This Court has jurisdiction to return the funds seized.  The seizures were made pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C) and 981(b).  18 U.S.C. § 981(b)(3) states that "Any motion for the return of property seized under this section shall be filed in the district court in which the seizure warrant was issued or in the district court for the district in which the property was seized."  The applicable seizure warrants were all issued from this Court.

Alternatively, the Movants request that this Court conduct an evidentiary hearing on the issues raised by this motion.  As grounds for this Motion, the Movants submit the following:

/ /

## II.    **Factual Background**

On October 17, 2014, the above-referenced seizure warrants were served on the Movants.  The warrants were based on alleged violations of 18 U.S.C. §§ 1343, 1956(c)(7)(F) and 981(b).  Based on the limited facts available, it is believed that the seizure was made pursuant to the allegedly improper Medicare billing of Mr. Tucker's business, CAIR Medical, Inc.  It appears that the Government initiated this action based on their understanding that a durable medical equipment provider (CAIR Medical, Inc.) cannot bill Medicare for any items provided to beneficiaries residing at a skilled nursing facility.

As of the date of this filing, with the exception of a possible sealed qui tam action, no criminal or civil action, including forfeiture, has been initiated with regard to this seizure.

## III.    **Argument**

The Government's entire ground for the seizure warrants is based on the incorrect claim that a durable medical equipment provider cannot bill Medicare for any items provided to beneficiaries residing at a skilled nursing facility.  This is an overly broad simplification of the law.  Medicare guidelines, administrative law judges, and the Health and Human Services Office of Inspector General have all consistently interpreted the regulations to mean an exception exists when beneficiaries live in the custodial care section of a skilled nursing facility.  The Government has entirely overlooked this circumstance and instead jumped the gun into an overzealous pursuit of the Movants' assets.

Apparently, the Government never reviewed the appropriate medical and billing records.  The Government did not pull CAIR Medical, Inc.'s records from Administrative Law Judges, who all issued favorable decisions on the exact same issue.  The Government did not even thoroughly research the applicable law and interpretations thereof.  Consequently, the Government's presentation to the Court of the seizure warrants' probable cause was likely deceptive.

**MOTION OF TODD TUCKER, ET AL., FOR RETURN OF PROPERTY**

A. **Medicare Guidelines, Administrative Law Judges, and the Office of Inspector General all Acknowledge that Durable Medical Equipment Providers may Bill Medicare for Beneficiaries at Skilled Nursing Facilities**

Generally, durable medical equipment providers cannot separately bill Medicare because the skilled nursing facilities are paid a bundled rate under Medicare Part A which takes equipment costs into consideration. However, when there is no Medicare Part A coverage, Medicare Part B may provide coverage in certain circumstances. This is what the Government failed to understand. As the Health and Human Services Office of Inspector General put it:

> Part B does not pay for DME provided during a nursing home stay unless the nursing home qualifies as a beneficiary's home. A nursing home qualifies as a beneficiary's home only if it does not provide primarily skilled care or rehabilitation….[D]istinct parts of nursing homes may qualify as a beneficiary's home….[Consequently,] if the remainder of that nursing home provides a nonskilled level of care, it could have DME coverage.

Dep't of Health and Human Servs. Office of Inspector Gen., OEI-06-07-00100, *Part B Services During Non-Part A Nursing Home Stays: Durable Medical Equipment* (July 2009) at i, 7. Attached as Exhibit A.

The Medicare Claims Processing Manual reiterates this understanding, stating "DME must be for use in the patient's residence other than a health care institution…except for a distinct part of a SNF, if one of these institutions has a distinct part that does not meet 1819(a)(1), the patient may be considered in his/her residence if he/she was physically located in such distinct part during the use period." [emphasis added]. *Medicare Claims Processing Manual*, Chapter 20 § 10.2 at 11-12. Attached as Exhibit B.

According to one reconsideration decision from C2C Solutions, Inc., "Before dispensing durable medical equipment and supplies, [suppliers must]

1   determine whether or not a beneficiary is in an inpatient stay on the date of
2   service…Medicare records indicate the beneficiary was not an inpatient/covered
3   under a SNF stay at the time the service was rendered." *See* Page 1 of Exhibit C.
4   In another decision, the administrative law judge cited the above mentioned
5   Medicare Claims Processing Manual section, and held a beneficiary who lived in
6   the custodial care section of a skilled nursing home was eligible for CAIR
7   Medical, Inc.'s tilt-in-space wheelchair. *See* Page 8 of Exhibit D.

8       Consequently, the Government's blanket statement that durable medical
9   equipment providers cannot bill for items provided to beneficiaries in skilled
10  nursing facilities is patently false and completely unsupported.

11      **B. CAIR Medical, Inc.'s Documentation Clearly Shows Compliance**
12      **with Applicable Medicare Regulations, Something the**
13      **Government Apparently did not Bother to Inspect**

14      In addition to receiving favorable determinations on appeal, CAIR Medical,
15  Inc. has taken great pains to clearly document whether a beneficiary is in custodial
16  care and residing in a distinct part of the skilled nursing facility.  In fact, letters
17  from the skilled nursing facilities verifying the beneficiaries as under custodial
18  care and residing in a distinct part of the facility are attached as Exhibit E.  CAIR
19  Medical, Inc. also has voluminous documentation of his employees calling the
20  skilled nursing facilities and verifying custodial care (sometimes multiple times).
21  CAIR Medical, Inc. further made certain to thoroughly document medical
22  necessity.  Like with the place of service issue, the majority of appeals on medical
23  necessity were favorable.  Attached please find favorable administrative law judge
24  decisions on medical necessity (Exhibit F).

25      Apparently, the Government did not bother to ask for or inspect the medical
26  records and instead, took as gospel the less than credible qui tam relator's
27  interpretation of the law.  The Government thus likely presented the wrong
28  standard of review to the Court as they never bothered to investigate the medical

**MOTION OF TODD TUCKER, ET AL., FOR RETURN OF PROPERTY**

1    records.  On the other hand, the administrative law judges, who have specific

2    knowledge of Medicare regulations, did investigate the medical records and

3    decided in favor of CAIR Medical, Inc.  This does not meet the probable cause

4    standard necessary to seize all of the Movants' property.

5        **C. Based on the Evidence, any Proceedings against CAIR Medical,**

6             **Inc. should be through the Administrative Appeals Process**

7        At the very worst, the claims in question could be denied due to the skilled

8    nursing facility's erroneous misrepresentation of a beneficiary's status.  However,

9    CAIR Medical, Inc. can hardly be faulted for relying upon a skilled nursing

10   facility's representation of where their patient is located and what type of care

11   their patient is under.  In fact, according to the Health and Human Services Office

12   of Inspector General, it was difficult for the Government itself to determine the

13   status of Medicare beneficiaries: "CMS and States do not maintain a primary level

14   of care designation for nursing homes that could facilitate accurate claim

15   submission by suppliers and proper claim adjudication by payment contractors."

16   Dep't of Health and Human Servs. Office of Inspector Gen., OEI-06-07-00100,

17   *Part B Services During Non-Part A Nursing Home Stays: Durable Medical*

18   *Equipment* (July 2009) at 6.  At any rate, the possibility of needing to appeal some

19   claims through the administrative appeal process cannot be equated with what has

20   amounted to putting a small company out of business on baseless grounds.

21       **D. The Tuckers and their Businesses will (and have already) Suffer**

22            **Irreparable Damage if the Property is not Returned**

23       Not only are the Government's actions baseless, but their overzealous

24   approach has put a small business on the verge of disaster.  CAIR Medical, Inc. no

25   longer has cash flow to service its desperate beneficiaries who, given the hostile

26   regulatory environment targeted at durable medical equipment companies, are

27   having trouble locating another provider.

28       Indeed, the Tuckers are barely able to meet the basic necessities of life.

**MOTION OF TODD TUCKER, ET AL., FOR RETURN OF PROPERTY**

Mrs. Tucker has advanced colon cancer and the current seizure of assets prevented Mr. Tucker from purchasing necessary medications for her post-surgery. With all their assets seized, the Tuckers have lost their livelihood and cannot run their businesses. Even if everything is resolved in favor of the Tuckers, the irreparable damage to their businesses' reputation will be permanent and they will be left without employment.

### E. The Government Acted with Callous Disregard for the Tuckers' Constitutional Right to Due Process

As shown above, Government's claim for seizure was legally baseless. It is likely that in their showing of probable cause to the Court, the Government did not present any of the Medicare guidelines and reports cited in this motion. The Government's negligent and complete misunderstanding of the law caused them to overzealously pursue Mr. and Mrs. Tucker's assets, thus violating their Fourth Amendment constitutional right to protection from unreasonable governmental seizure of property. It is unreasonable for the Government to take action without thoroughly researching the legal basis for the seizure. It is unreasonable for the Government to take action apparently without inspecting medical records or accruing other evidence. The Government has failed to show probable cause of any billing impropriety, making this seizure entirely unlawful.

/ /
/ /
/ /
/ /
/ /
/ /
/ /
/ /
/ /

8

## IV.   <u>Conclusion</u>

For the reasons stated above, the Movants respectfully request that the Court order the return of funds and property seized in the above-referenced seizure warrants.   Alternatively, the Movants request that this Court conduct an evidentiary hearing on the issues raised by this Motion.


Dated: November 6, 2014                    Respectfully Submitted,

KHOURI LAW FIRM


By:   *Michael J Khouri*
_____
MICHAEL J. KHOURI
Attorney for Movants,
TODD TUCKER, et al.

MOTION OF TODD TUCKER, ET AL., FOR RETURN OF PROPERTY

## DECLARATION OF TODD TUCKER

I, Todd Tucker, declare as follows:

1. I am the President of CAIR Medical, Inc., a California corporation.

2. CAIR Medical, Inc. owns Account Number 2202059 at Golden State Bank in Brea, California, which was seized by the Government under Seizure Warrant Case Number SA14-MJ-377.

3. Me and my wife (Dawn Tucker) own Account Number 2002905 at Golden State Bank in Brea, California, which was seized by the Government under Seizure Warrant Case Number SA14-MJ-378.

4. I am the President of Rehab Fitness, Inc. d.b.a. Citizen Crossfit. Citizen Crossfit is a membership gym for physical fitness and has nothing to do with Medicare billing or CAIR Medical, Inc.

5. Rehab Fitness, Inc. d.b.a. Citizen Crossfit owns Account Number 2204899 at Golden State Bank in Brea, California, which was seized by the Government under Seizure Warrant Case Number SA14-MJ-379.

6. I am the owner of Account number 000984502354 at Bank of America, which was seized by the Government under Seizure Warrant Case Number SA14-MJ-381.

7. I am the registered owner of the 2013 Nissan, California License Plate Number 7CTU314, VIN: 1N6BF0KMXDN100216. This motor vehicle was seized under Seizure Warrant Case Number SA14-MJ-389.

8. I am the registered owner of the 2012 Chevrolet, California License Plate Number 6ZOW578, VIN: 1GNSKBE01CR165361. This motor vehicle was seized under Seizure Warrant Case Number SA14-MJ-385.

9. I am the registered owner of the 2010 Mercedes, California License Plate Number 7BRT530, VIN: 4JGCB6FE6AA110653. This motor vehicle was seized under Seizure Warrant Case Number SA14-MJ-387.

10. I am the registered owner of the 2007 Toyota, California License Plate

1

Number 5XAR336, VIN: JTDKB20U177555915. This motor vehicle was seized under Seizure Warrant Case Number SA14-388M.

11. I am the registered owner of the 2005 BMW, California License Plate Number 6VMF643, VIN: WBABD33445JY99036. This motor vehicle was seized under Seizure Warrant Case Number SA14-390M.

12. My company, CAIR Medical, Inc., appealed Medicare Claim Number 14045827497002. Medicare issued CAIR Medical, Inc. a favorable appeal decision under Medicare Appeal Number 1-2424524844, a copy of which is attached as Exhibit C.

13. My company, CAIR Medical, Inc., appealed the Medicare claim which U.S. Administrative Law Judge Richard Bush entered a fully favorable decision under ALJ Appeal No. 1-979572781, a copy of which is attached as Exhibit D.

14. In preparation for an administrative law judge hearing, my company, CAIR Medical, Inc., obtained the letters verifying custodial care and residence in distinct parts of skilled nursing facilities, a copy of which is attached as Exhibit E.

15. My company, CAIR Medical, Inc., appealed the Medicare claim which U.S. Administrative Law Judge LeAnn Canter entered a fully favorable decision under ALJ Appeal No. 1-976457261. CAIR Medical, Inc. also appealed the Medicare claim which U.S. Administrative Law Judge Richard Bush entered a fully favorable decision under ALJ Appeal No. 1-979623794. Copies of both decisions are attached as Exhibit F.

16. It was the procedure at CAIR Medical, Inc. to have employees call the skilled nursing facilities and verify the beneficiary's custodial care status and that the beneficiary was residing in a distinct part of the nursing facility. I have located the paperwork documenting such on 100 claims and can produce them if necessary.

2

**DECLARATION OF TODD TUCKER**

17.  It was the procedure at CAIR Medical, Inc. to thoroughly document the medical necessity of the item provided to each beneficiary.   This documentation on hundreds of claims can be produced if necessary.   Such documentation included:

- Delivery Ticket/Work Order;
- Patient Equipment Education and Home Safety Checklist;
- Notification of Medicare Capped Rental;
- Equipment Warranty Form;
- Specialty Measurement Evaluation signed by a licensed medical professional, a CAIR Medical Assistive Technology Practitioner, and a physician;
- Signed physician prescription;
- Detailed product description;
- Chart Notes documenting need for the equipment;
- Functional Mobility Evaluation signed by the treating healthcare practitioner;
- Wheelchair & Seating Evaluation and Justification;
- Beneficiary Consent/Waiver Form;
- Financial Attestation/Release of Medical Documentation; and
- Supporting medical records from the treating provider

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this ___day of November, 2014 in Irvine, California.


_____

TODD TUCKER, Declarant

3

**DECLARATION OF TODD TUCKER**

17. It was the procedure at CAIR Medical, Inc. to thoroughly document the medical necessity of the item provided to each beneficiary. This documentation on hundreds of claims can be produced if necessary. Such documentation included:

- Delivery Ticket/Work Order;
- Patient Equipment Education and Home Safety Checklist;
- Notification of Medicare Capped Rental;
- Equipment Warranty Form;
- Specialty Measurement Evaluation signed by a licensed medical professional, a CAIR Medical Assistive Technology Practitioner, and a physician;
- Signed physician prescription;
- Detailed product description;
- Chart Notes documenting need for the equipment;
- Functional Mobility Evaluation signed by the treating healthcare practitioner;
- Wheelchair & Seating Evaluation and Justification;
- Beneficiary Consent/Waiver Form;
- Financial Attestation/Release of Medical Documentation; and
- Supporting medical records from the treating provider

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 4 day of November, 2014 in Irvine, California.

TODD TUCKER, Declarant

**DECLARATION OF TODD TUCKER**

# DECLARATION OF DAWN TUCKER

I, Dawn Tucker, declare as follows:

1. I am the President of A to Z Solutions.

2. A to Z Solutions owns Account Number 2204725 at Golden State Bank in Brea, California, which was seized by the Government under Seizure Warrant Case Number SA14-MJ-380.

3. My husband, Todd Tucker, and I own Account Number 2002905 at Golden State Bank in Brea, California, which was seized by the Government under Seizure Warrant Case Number SA14-MJ-378.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this ___ day of November, 2014 in Irvine, California.

_____

DAWN TUCKER, Declarant

1

**DECLARATION OF DAWN TUCKER**

## **DECLARATION OF DAWN TUCKER**

I, Dawn Tucker, declare as follows:

1. I am the President of A to Z Solutions.

2. A to Z Solutions owns Account Number 2204725 at Golden State Bank in Brea, California, which was seized by the Government under Seizure Warrant Case Number SA14-MJ-380.

3. My husband, Todd Tucker, and I own Account Number 2002905 at Golden State Bank in Brea, California, which was seized by the Government under Seizure Warrant Case Number SA14-MJ-378.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 4 day of November, 2014 in Irvine, California.

DAWN TUCKER, Declarant

I

**DECLARATION OF DAWN TUCKER**

# EXHIBIT A

Department of Health and Human Services

**OFFICE OF
INSPECTOR GENERAL**

# PART B SERVICES DURING NON-PART A NURSING HOME STAYS: DURABLE MEDICAL EQUIPMENT



Daniel R. Levinson
Inspector General

July 2009
OEI-06-07-00100

# *Office of Inspector General*
### http://oig.hhs.gov

The mission of the Office of Inspector General (OIG), as mandated by Public Law 95-452, as amended, is to protect the integrity of the Department of Health and Human Services (HHS) programs, as well as the health and welfare of beneficiaries served by those programs. This statutory mission is carried out through a nationwide network of audits, investigations, and inspections conducted by the following operating components:

## *Office of Audit Services*

The Office of Audit Services (OAS) provides auditing services for HHS, either by conducting audits with its own audit resources or by overseeing audit work done by others. Audits examine the performance of HHS programs and/or its grantees and contractors in carrying out their respective responsibilities and are intended to provide independent assessments of HHS programs and operations. These assessments help reduce waste, abuse, and mismanagement and promote economy and efficiency throughout HHS.

## *Office of Evaluation and Inspections*

The Office of Evaluation and Inspections (OEI) conducts national evaluations to provide HHS, Congress, and the public with timely, useful, and reliable information on significant issues. These evaluations focus on preventing fraud, waste, or abuse and promoting economy, efficiency, and effectiveness of departmental programs. To promote impact, OEI reports also present practical recommendations for improving program operations.

## *Office of Investigations*

The Office of Investigations (OI) conducts criminal, civil, and administrative investigations of fraud and misconduct related to HHS programs, operations, and beneficiaries. With investigators working in all 50 States and the District of Columbia, OI utilizes its resources by actively coordinating with the Department of Justice and other Federal, State, and local law enforcement authorities. The investigative efforts of OI often lead to criminal convictions, administrative sanctions, and/or civil monetary penalties.

## *Office of Counsel to the Inspector General*

The Office of Counsel to the Inspector General (OCIG) provides general legal services to OIG, rendering advice and opinions on HHS programs and operations and providing all legal support for OIG's internal operations. OCIG represents OIG in all civil and administrative fraud and abuse cases involving HHS programs, including False Claims Act, program exclusion, and civil monetary penalty cases. In connection with these cases, OCIG also negotiates and monitors corporate integrity agreements. OCIG renders advisory opinions, issues compliance program guidance, publishes fraud alerts, and provides other guidance to the health care industry concerning the anti-kickback statute and other OIG enforcement authorities.

◤ E X E C U T I V E   S U M M A R Y

## OBJECTIVE

To determine the extent of inappropriate Medicare Part B payments for durable medical equipment (DME) provided to nursing home residents during non-Part A stays in 2006.

## BACKGROUND

Medicare Part A covers nursing home care for a beneficiary's stay of up to 100 days in a skilled nursing facility (SNF). If nursing home care is still needed after the 100 days or the beneficiary did not qualify for a Part A SNF stay, Medicare Part B may provide coverage for certain medical and other health care services. However, Part B does not pay for DME provided during a nursing home stay unless the nursing home qualifies as a beneficiary's home. A nursing home qualifies as a beneficiary's home only if it does not provide primarily skilled care or rehabilitation. Only a small number of nursing homes that are certified Medicaid-only, called nursing facilities (NF), or distinct parts of nursing homes (hereafter referred to as distinct part nursing homes) may qualify as a beneficiary's home. In contrast, no SNFs or dually certified nursing homes (those certified for both Medicare and Medicaid) qualify as a beneficiary's home because they provide primarily skilled care or rehabilitation. To identify inappropriate payments for DME, we used resident assessment data from the Centers for Medicare & Medicaid Services (CMS) to determine all nursing home stays nationwide during 2006. We then analyzed related Medicare claims data for any DME payments during these stays.

## FINDINGS

**Medicare Part B allowed inappropriate payments of $30 million in 2006 for DME provided during non-Part A stays in Medicare-certified SNFs.** Medicare paid 77 percent ($23.4 million) of these claims, and the remaining 23 percent ($7.1 million) was paid by or on behalf of beneficiaries (i.e., by Medicaid, supplemental insurance, or private resources). For 98 percent of these claims, suppliers incorrectly indicated that the DME was for use in the beneficiary's home. Wheelchairs and oxygen accounted for 72 percent ($22 million) of the inappropriately allowed DME payments. Suppliers also indicated on claims whether the DME was purchased or rented by the beneficiary. We found that the inappropriately allowed DME payments were mostly

EXECUTIVE  SUMMARY

rentals (76 percent or $22.9 million) for which there are payment limitations upon a beneficiary's nursing home admission.

**Nearly all of the additional $11.9 million Medicare allowed for DME provided during non-Part A stays in Medicaid NFs and distinct part nursing homes was inappropriate.** This conclusion is based on our survey of a sample of 84 NFs and distinct part nursing homes to determine the extent to which they provide primarily a skilled level of care or rehabilitation. Survey results indicate that nearly all of these nursing homes provide primarily skilled care or rehabilitation. Consequently, we concluded that nearly all $11.9 million in DME payments for Medicare beneficiaries in these nursing homes was inappropriately allowed. As with stays in SNFs and dually certified SNF/NFs, the inappropriately allowed DME was nearly always billed identifying the place of service as the beneficiary's home (97 percent), mostly for wheelchairs and oxygen (72 percent), and made up mostly of rentals (78 percent).

**CMS and States do not maintain a primary level of care designation for nursing homes that could facilitate accurate claim submission by suppliers and proper claim adjudication by payment contractors.** When suppliers prepare DME claims or claims are processed for payment by Medicare Administrative Contractors (MAC), it is important that the appropriate place of service code be utilized. If a beneficiary resides in a NF or distinct part nursing home that does not provide primarily a skilled level of care or rehabilitation, the supplier should identify "home" as the place of service. However, suppliers that code place of service and MACs that adjudicate claims do not have ready access to the primary level of care status of NFs and distinct part nursing homes unless this information is provided directly by these facilities. They lack access to this information because CMS or States did not make these determinations and maintain results in an accessible database. However, CMS reported that it does not maintain information regarding primary level of care for NFs and distinct parts and indicated that States have the responsibility for maintaining this information. We contacted all State agencies in an attempt to determine the primary level of care provided by NFs and distinct part nursing homes. State agency representatives in 21 States reported that nursing homes that are licensed in their States must provide primarily skilled care or rehabilitation. Of these 21 States, 13 have statutes that specifically require this level of care for State licensure. In the remaining 29 States, there may be nursing homes that do not provide

primarily skilled care or rehabilitation or include a distinct part that does not provide primarily skilled care or rehabilitation.

## RECOMMENDATIONS

When setting DME payment policy, Congress recognized the responsibility of institutions to meet patients' medical needs, regardless of the primary payer for the stays (i.e., Medicare, Medicaid, or private resources).  Consequently, each nursing home must provide DME as an integral part of its basic daily rate unless it is not providing primarily skilled care or rehabilitation.  Yet, very few nursing homes provide care lower than skilled.  Although payment contractors routinely deny DME payment for claims submitted with a nursing home place of service designation, an incorrect place of service designation (i.e., home) results in inappropriate payment.  Past OIG studies have highlighted this issue; however, payment controls are still insufficient to stop inappropriate DME payments.

Given the extent of inappropriate DME payments, we recommend that CMS:

**Use electronic resident assessment data contained in the Minimum Data Set (MDS) to establish a routine process to periodically (e.g., annually) generate a list of non-Part A beneficiary stays in nursing homes that provide primarily skilled care or rehabilitation.**  CMS should then direct contractors to identify and recover inappropriate DME payments.  Further, CMS should direct contractors to identify suppliers that repeatedly submit incorrect place of service on DME claims and forward such information to the OIG Office of Investigations.

**Implement a process or processes to identify patients entering nursing homes with rented DME.**  Nursing homes could use this information to alert suppliers of the beneficiary's change of address.

**Determine which NFs and distinct part nursing homes provide primarily skilled care, thus not qualifying as a beneficiary's home for DME payment purposes.**  State Medicaid agencies and CMS do not evaluate and maintain this information.  At a minimum, CMS could require State Medicaid agencies to make the determination using the available CMS administrative criteria.  This designation should then be available to claims processors, nursing homes, and suppliers.

**Direct contractors to recoup the inappropriate payments identified in this report.** We will forward claim-specific information to CMS under separate cover.

## AGENCY COMMENTS AND OFFICE OF INSPECTOR GENERAL RESPONSE

CMS concurred with our recommendations to establish a routine process to periodically identify non-Part A stays using MDS and to recover inappropriate payments identified in this study. The draft report also recommended that CMS (1) expand the resident assessment process to identify whether the patient entered the nursing home with DME and (2) use the Online Survey Certification and Reporting system to determine and report which NFs and distinct part nursing homes qualify as beneficiary homes for DME payment purposes. Although agreeing with the underlying objectives of these two recommendations, CMS suggested alternative approaches using claims processing edits to address them. In this final report, we defer to CMS on the appropriate methods to use to address these recommendations. However, we ask that CMS provide specific information on these alternative approaches in its final management decision.

For the full text of CMS's comments, see Appendix D.