# ► TABLE OF CONTENTS

EXECUTIVE SUMMARY .................................... i

INTRODUCTION......................................... 1

FINDINGS............................................. 13

Medicare Part B inappropriately allowed $30 million in 2006
for DME provided during non-Part A stays in Medicare-certified
SNFs .................................................. 13

Nearly all of the additional $11.9 million that Medicare allowed
for DME provided during non-Part A stays in Medicaid-certified
NFs and distinct part nursing homes was inappropriate ......... 15

CMS and States do not maintain a primary level of care
designation for nursing homes that could facilitate accurate claim
submission by suppliers and proper claim adjudication by payment
contractors............................................ 16

RECOMMENDATIONS ..................................... 17

Agency Comments and Office of Inspector General Response.... 18

APPENDIXES .......................................... 19

A: Skilled Nursing Facility Definition ....................... 19

B: Durable Medical Equipment Billing Codes ................. 23

C: Defining Primary Level of Care ......................... 24

D: Agency Comments.................................... 26

ACKNOWLEDGMENTS.................................... 29

 I N T R O D U C T I O N

## OBJECTIVE

To determine the extent of inappropriate Medicare Part B payments for durable medical equipment (DME) provided to nursing home residents during non-Part A stays in 2006.

## BACKGROUND

### Medicare and Medicaid Programs

Nursing homes offer daily living assistance to elderly and disabled individuals who are either physically or mentally unable to live independently. Nursing home patients receive a wide array of services ranging from medical treatment to meals and from skilled to custodial care. Of the available public programs that pay for nursing home care, Medicare and Medicaid represent the largest.

*Medicare.* Medicare, a Federal health insurance program, covers most people 65 years or older, people under age 65 with certain disabilities, and people of any age diagnosed with end-stage renal disease. It provides a wide range of benefits from institutional care (e.g., nursing home stays) to medical products and supplies (e.g., wheelchairs). Medicare is administered by the Centers for Medicare & Medicaid Services (CMS), which contracts with entities called Medicare Administrative Contractors (MAC) to process and pay claims for covered services. Medicare-covered services most frequently fall under Parts A and B.

- Part A (hospital insurance) helps cover skilled or rehabilitative care during beneficiary stays in skilled nursing facilities (SNF); these stays are called "Part A stays." Medicare Part A[1] was the primary payer for 13 percent of the nursing home residents in 2006.[2] During a Part A stay in a SNF, Medicare Part A pays for the beneficiary's services in the facility using a consolidated daily rate. This daily rate covers many routine services provided by SNFs, including room

---

[1] Medicare Part A pays for up to 100 days in a SNF benefit period, also known as spell of illness, if a beneficiary meets certain conditions, such as a prior hospitalization. The SNF benefit period begins the day a beneficiary enters the SNF and ends when the beneficiary has not received any subsequent hospital or SNF care for 60 consecutive days.

[2] C. Harrington, H. Carrillo, and B. W. Blank, "Nursing, Facilities, Staffing, Patients, and Facility Deficiencies, 2000 Through 2006," p. 18. Department of Social and Behavioral Sciences, University of California, San Francisco. Available online at http://www.ncenhr.org/uploads/PartI-PagesfromHarringtonOSCARcomplete2006.pdf. Accessed in March 2008.

I N T R O D U C T I O N

and board, skilled care, and rehabilitative care. Examples of skilled care include changing sterile dressings and administering prescribed medications; examples of rehabilitative care include physical, speech, or occupational therapies.

When a beneficiary exhausts the 100 days of care allowed under the Part A benefit (or did not otherwise qualify for a SNF stay) and continues to reside in the SNF, the subsequent days then constitute a "non-Part A stay." During a non-Part A stay, Medicare no longer pays for the stay; however, Part B may pay for therapy and supplies previously included in the daily rate paid to the SNF.

- **Part B (medical insurance)** helps cover a wide range of medical services and supplies. These services include physician services and medical equipment and supplies, including DME.

  Durable Medical Equipment. DME is generally defined as equipment that can withstand repeated use, serves primarily a medical purpose, is not generally useful to a person in the absence of an illness, and is appropriate for use in a resident's home.[3] Examples of DME include oxygen and respiratory equipment and supplies, wheelchairs, hospital beds, walkers, commodes, and blood glucose monitors. In most instances, Medicare will pay for rented or purchased DME,[4] as well as cover repairs of purchased equipment and necessary related supplies (e.g., glucose test strips and oxygen).[5]

  In 2006, Medicare Part B benefits totaled $166 billion for 40 million beneficiaries.[6] Of this amount, approximately $11.7 billion was for DME.

  Part B Supplier Billing and Payment. Medicare-enrolled suppliers provide DME to Medicare beneficiaries and then submit claims to one of four regional MACs, called DME MACs. Section 1842(s) of the Act authorizes a fee schedule for many Part B services, including

---

[3] CMS, "Medicare Benefit Policy Manual" (MBPM). Available online at Medicare Benefit Policy Manual, Chapter 15, § 110.1. Accessed in June 2008.

[4] Social Security Act (the Act), § 1861(n). See also 42 CFR 410.38 (a).

[5] CMS, "Medicare Claims Processing Manual." Available online at Medicare Claims Processing Manual, Chapter 20, § 10.2. Accessed in June 2008.

[6] CMS, "Brief Summaries of Medicare & Medicaid," November 1, 2007. Available online at http://www.cms.hhs.gov/MedicareProgramRatesStats/downloads/MedicareMedicaidSummaries2007.pdf. Accessed in June 2008.

INTRODUCTION

certain equipment and supplies, which Medicare contractors use to reimburse claims.[7]  Generally, Medicare pays 80 percent of the allowed amount, and the beneficiary is responsible for the remaining 20 percent.  For reimbursement purposes, suppliers must identify the DME item for which they are billing using a specific code from the Healthcare Common Procedure Coding System (HCPCS).

Home Use Provision.  In addition to medical necessity and coding accuracy requirements, Medicare payment determinations for DME provided to residents of nursing homes are driven by whether the nursing home provides primarily skilled care or rehabilitation.[8]  (See Appendix A.)  If the nursing home provides primarily skilled care or rehabilitation, DME is not covered.  This noncoverage stems from the legal requirement that DME be used in a beneficiary's home or an institution that can be considered a home.  Section 1861(n) of the Act states that any nursing home meeting the basic definition of a SNF in § 1819(a)(1) of the Act may not be considered a patient's home for this purpose.  Thus, only when a nursing home provides primarily a nonskilled level of care and few rehabilitation services can it be considered a beneficiary's home and qualify for DME payment.

Exceptions to Home Use Provision.  Under two exceptions, Medicare pays for DME provided in nursing homes that do not qualify as a beneficiary's home:

(1)     The DME was initially provided to the beneficiary at his/her home prior to admittance to a nursing home.  If this occurs, the beneficiary may have rented the DME during the month in which he/she enters a nursing home.  Medicare will pay for the DME rental for the remainder of the monthly rental period that overlaps the nursing home admission.  DME MACs will direct the billing supplier to submit its bill indicating home as the place of service.[9]

---

[7] Fee schedule implemented on January 1, 2002, and updated annually.

[8] CMS, Medicare Learning Network Matters Article #SE0745, October 25, 2007.  Available online at http://www.cms.hhs.gov/MLNMattersArticles/2007MMAN/itemdetail.asp?filterType=none&filterByDID=99&sortByDID=8&sortOrder=ascending&itemID=CMS1204646&intNumPerPage=10.  Accessed on May 6, 2008.

[9] CMS, MBPM, chapter 15 § 110.5.  Available online at http://www.cms.hhs.gov/manuals/Downloads/bp102c15.pdf.  Accessed in June 2008.

> (2)   The DME was provided to the beneficiary in anticipation of a discharge from a nursing home to his/her home.  In this instance, Medicare will allow the DME payment for the beneficiary up to 2 days prior to a nursing home discharge when the DME is intended for home use.  DME MACs will direct the billing supplier to use the discharge date for the service date and indicate home as the place of service.

_Medicaid._  Medicaid was the primary payer for 65 percent of nursing home stays during 2006.[10]  All of these stays were non-Part A stays because Medicare did not pay for them.  Unlike Medicare, Medicaid is a joint State-Federal program administered by the States.  Within broad Federal guidelines, States establish their own eligibility standards encompassing Federal requirements and available options; thus, every State operates its Medicaid program differently.  However, all State Medicaid programs include routine DME as a service covered under the facility daily rate.[11] [12]  To ensure that Medicaid recipients with Medicare eligibility receive Part B benefits during their nursing facility (NF) stays and to facilitate payment by Part B, State Medicaid programs routinely pay Part B premiums for qualified beneficiaries.

**Related Payment Legislation**

Congress has recognized the responsibility of nursing homes to meet the medical needs of patients, regardless of the primary payer of the stay (i.e., Medicare, Medicaid, or private resources).  Statutes such as the Omnibus Budget Reconciliation Act of 1987 (OBRA 1987) laid the foundation for identifying needed patient care through resident assessments.[13]  The OBRA 1987 further required that nursing homes provide the necessary care to assist residents in attaining their highest practicable level of physical, mental, and psychosocial well-being.  Congress also enacted legislation such as the Balanced Budget Act of 1997 (BBA)[14] and the Medicare, Medicaid, and SCHIP Benefits

---

[10] C. Harrington, et al., loc. cit.

[11] The Henry J. Kaiser Family Foundation, "Medicaid Benefits:  Online Database." Available online at http://www.kff.org/medicaid/benefits/index.jsp?CFID=32790568&CFTOKEN=15412220. Accessed in June 2008.

[12] 42 CFR § 488.301.

[13] P.L. No. 100-203.

[14] P.L. No. 105-33.

INTRODUCTION

Improvement and Protection Act of 2000 (BIPA)[15] to further define Medicare payment criteria for nursing homes.

The BBA established a prospective payment system for Part A stays and required nursing homes to arrange for and consolidate into a single Medicare bill the Part B services that are needed by a resident during his or her nursing home stay.[16] Prior to the BBA, suppliers and providers of Part B services for nursing home residents (e.g., physical therapists) billed Medicare directly for their services. Implementation of consolidated billing first occurred only for Part A stays. In 2000, before the BBA was implemented for non-Part A stays, Congress enacted the BIPA. The BIPA maintained consolidated billing for Part A stays and therapy services but repealed consolidated billing requirements for non-Part A stays. Therefore, claims for beneficiaries during non-Part A stays continue to be individually submitted by suppliers and providers.

**Mandate for the Office of Inspector General To Monitor Part B Payments**
In repealing the BBA's consolidated billing provisions for non-Part A nursing home stays, Congress anticipated the need to monitor Medicare Part B payments during these stays. In section 313 of the BIPA, Congress specifically directed the Office of Inspector General (OIG) to perform such monitoring. This DME evaluation revisits the study entitled "Durable Medical Equipment Payments in Nursing Homes" (OEI-06-92-00862), in which OIG identified inappropriate payments of $35 million for DME provided during nursing home stays in 1992, much of which occurred during non-Part A stays. Several additional studies will address other, previously identified, vulnerable Part B payment areas (e.g., enteral nutrition therapy and psychotherapy).

**Primary Level of Care and Certification of Nursing Homes**
The Act established minimum health and safety standards[17] that must be met by suppliers and providers of services participating in the Medicare and Medicaid programs. To receive payment under either of these programs, nursing homes must comply with the standards set forth in 42 CFR pt. 483, subpart B. CMS has oversight over both

---

[15] P.L. No. 106-554.

[16] BBA, § 4432.

[17] The Act, §§ 1819 and 1919, establish requirements for nursing homes to participate in Medicare and Medicaid. See also 42 CFR §§ 483 and 488.

I N T R O D U C T I O N

programs but contracts with States to perform surveys that ensure nursing home compliance.

In 2006, 3.2 million individuals received nursing home care in 16,121 nursing homes certified for Medicare or Medicaid.[18] Of these nursing homes, States surveyed 15,294 in 2006. Based on specific survey criteria, a nursing home may be certified as a Medicare SNF, a Medicaid NF, a dually certified SNF/NF, or a distinct part SNF or NF. However, defining a nursing home's primary level of care is not a specific component of certification surveys. Although the certification of a SNF or dually certified SNF/NF for Medicare clearly indicates that a nursing home provides primarily a skilled level of care or rehabilitation, certification as a NF may not be used as the sole indicator of the primary level of care provided.

*Medicare skilled nursing facility.* Both SNF and dually certified SNF/NF certification criteria require sufficiently high nurse staffing levels that such nursing homes are clearly providing primarily skilled care or rehabilitation. (See Appendix A for CMS policy defining DME coverage in nursing homes.) Dual certification as a SNF/NF results in the same outcome: the facility provides primarily skilled care. Between 2002 and 2006, the number of SNFs decreased by just over 18 percent from 1,058 to 864, accounting for 5 percent of certified nursing homes. During the same time period, the number of dually certified SNF/NFs increased by 2 percent, from 14,013 to 14,298, and accounted for nearly 89 percent of certified nursing homes.[19]

*Medicaid nursing facility.* Between 2002 and 2006, the number of NFs decreased by nearly 50 percent, from 1,913 to only 959 (5 percent of certified nursing homes).[20] Medicaid certification requirements for NFs are virtually the same as those for Medicare certification of SNFs. For payment purposes, DME MAC policies state that billing for DME for a patient in a SNF or a NF will be denied, in effect taking the stand that both SNFs and NFs provide skilled care or rehabilitative services. However, this payment policy does not take into account that, unlike Medicare certification, Medicaid certification of a NF can provide for a nonskilled level of care. This level of care would allow a NF to be considered as a beneficiary's home for DME coverage purposes. Thus,

---

[18] CMS, "Nursing Home Data Compendium," 2007 Edition.
[19] Ibid.
[20] Ibid.

INTRODUCTION

as a certification class, NFs cannot be assumed to be providing primarily skilled care or rehabilitation for DME payment purposes. CMS or States would need to evaluate each NF using specific administrative criteria to determine whether the NF provides primarily skilled care or a level of care below skilled. If the latter, the NF could be considered a home.[21] Only for beneficiaries in these facilities should DME suppliers indicate home as the place of service on submitted claims.

*Distinct part nursing home.* Generally, CMS and States evaluate a nursing home's certification as a single unit, rather than by separately evaluating and classifying individual areas or beds within the institution. However, some States allow a nursing home to designate a particular portion of its nursing home, known as a "distinct part," separately from the rest of the nursing home.[22] Medicare and Medicaid regulations define a distinct part as a separate, physically identifiable unit consisting of all the beds in a particular building, floor, wing, or ward.[23] Using the CMS Online Survey Certification and Reporting system (OSCAR), we identified 2,725 distinct part nursing homes.[24] However, OSCAR did not identify whether the distinct part was a SNF or a NF, a critical designation for determining DME payment. As with a SNF, a distinct part SNF providing primarily skilled care or rehabilitation would not have DME coverage.[25] However, if the remainder of that nursing home provides a nonskilled level of care, it could have DME coverage. The opposite situation would allow DME coverage for a beneficiary residing in a distinct part NF not providing primarily a skilled level of care, but not in the remainder of the nursing home providing primarily skilled or rehabilitative care.

---

[21] Administrative criteria to identify NFs or distinct part nursing homes that meet the basic SNF definition may be used by State agencies conducting certification surveys. These criteria appear in CMS's "State Operations Manual" (SOM), chapter 2, § 2166. Available online at http://www.cms.hhs.gov/manuals/downloads/som107c02.pdf. Accessed in June 2008.

[22] CMS, SOM, chapter 2 § 2762B(4). Available online at http://www.cms.hhs.gov/manuals/downloads/som107c02.pdf. Accessed in June 2008.

[23] 42 CFR § 483.5(b).

[24] Data extracted from OSCAR by OIG on April 1, 2007.

[25] CMS, MBPM. Available online at http://www.cms.hhs.gov/manuals/Downloads/bp102c15.pdf. Accessed in June 2008.

I N T R O D U C T I O N

### Suppliers and Place of Service Coding

Suppliers must designate the physical location of the beneficiary, called place of service, on submitted claims. For billing purposes, CMS utilizes place of service codes ranging from 01 through 99. A DME claim submitted with a place of service code for a SNF or NF will be denied.[26] An electronic claims-processing system edit adjudicates each claim and generates a denial when a SNF or NF place of service has been coded. However, if the NF provides a level of care below skilled or rehabilitative, it can be considered the beneficiary's home for billing purposes. In such situations, the supplier should appropriately designate home, not a NF, as the place of service on the claim. However, it becomes more difficult for a supplier to accurately identify the place of service for a beneficiary who moves from his or her home to a nursing home. This is particularly problematic for payment purposes when the beneficiary has rented DME prior to the nursing home admission.

Following the monthly rental period during which the beneficiary moved to a nursing home that may not be considered his or her home, the DME claim should show the actual place of service as a SNF or NF, which would result in a denial of payment by the DME MAC. If the patient resides in a NF or distinct part nursing home that may be considered a beneficiary's home, the claim may still indicate home as the place of service. Yet, CMS, DME MACs, and States do not inform suppliers that a beneficiary has relocated to a nursing home. CMS policies require that suppliers submit accurate claims, but do not provide guidance on how or how frequently they must ensure the accuracy of the beneficiary's place of service. Ultimately, suppliers depend on the beneficiary or his/her responsible parties to tell them when a beneficiary moves into a nursing home. There is no way for suppliers to ensure that the beneficiaries do so. Nor do CMS or DME MACs have the means to notify a nursing home when a beneficiary has rental DME at the time of admittance; claims processing systems currently are inadequate for such a purpose. Further, nursing homes have not been directed by CMS to obtain this information from beneficiaries at the time of admittance.

---

[26] Noridian, DME MAC. "Supplier Manual," chapter 5. Available online at https://www.noridianmedicare.com/dme/news/manual/chapter5.html#inpatient. Accessed in February 2008.

INTRODUCTION

## METHODOLOGY

### Scope

This study identifies inappropriately allowed Part B payments for DME during non-Part A nursing home stays in 2006. A non-Part A nursing home stay is any Medicare beneficiary's nursing home stay which is not paid for under the Medicare Part A SNF benefit. If a beneficiary's stay started under the Part A SNF benefit and continued after exhausting this benefit, only DME delivered during the latter portion of the stay is considered.

### Identification of DME During a Nursing Home Stay

We utilized several databases obtained from CMS to identify Part B payments for DME during non-Part A nursing home stays. These databases included the Minimum Data Set (MDS), OSCAR, the Enrollment Database (EDB), and National Claims History (NCH).

*Minimum Data Set.* We used the MDS to identify the nursing home residents, related nursing homes, and nursing home stays. The MDS, a component of the resident assessment instrument, includes information about each resident's health, physical functioning, mental status, and general well-being.[27] However, assessments do not capture whether a beneficiary is renting DME at the time of nursing home admission. Resident assessments are reported electronically by each certified nursing home for each person upon admission and are updated at least quarterly.[28] The MDS includes nursing home admission and discharge dates. States receive assessments from nursing homes and transmit the data to CMS. Using the MDS data, we identified all assessed residents and their Social Security numbers (SSN). To determine stay dates, we extracted all nursing home admission and discharge dates for each resident.

We used assessment dates as proxies for missing admission or discharge dates according to the following assumptions:

- If the resident was in the nursing home on January 1, 2006 (determined from subsequent assessments that were conducted by the nursing homes), we used the date of the first assessment conducted in 2005 as the admission date.

---

[27] OBRA 1987.

[28] More frequent assessments are required for stays paid under the Part A SNF benefit.

I N T R O D U C T I O N

- In the case of a missing discharge date, we defined the date of the last assessment (received through March 2007) as the date of discharge.

*OSCAR*. To obtain information about the nursing home (e.g., facility name, address, number of beds, and SNF and NF certification status), we linked the MDS facility identification number with the facility number maintained in the OSCAR. The OSCAR contains survey results from certification and complaint surveys.

*Enrollment Database*. We used the EDB to identify Medicare beneficiaries. This database includes beneficiary-level data (i.e., name, SSN, and Medicare Health Insurance Claim Number (HICN)). Using this database, we crosswalked SSNs contained in the MDS file to SSNs in the EDB to identify Medicare beneficiaries and their associated HICNs. We excluded beneficiaries having no matching SSN from further analysis.

*National Claims History*. We identified DME claims and payments using the NCH. We used the HICNs from the EDB to crosswalk to HICNs in the NCH to identify all DME claims billed and allowed for Medicare beneficiaries during the nursing home stays previously identified using the MDS. We then dropped all DME billed for beneficiaries during Part A paid nursing home or inpatient hospital stays.[29]  (See Appendix B for a list of the DME HCPCS codes utilized for this study.)

Finally, we excluded DME during exception time periods. We identified and excluded DME claims occurring during the two allowed exception time periods—rental payment for the month overlapping any admission to a nursing home from home and DME provided within 2 days of a beneficiary's discharge from the nursing home. To be conservative, we determined that claims with nursing home admissions between the "from" and "through" dates for DME met the exception period, regardless of claim length. Additionally, if the claim "through" date was the same as the discharge date from the nursing home, we determined that the claim met the exception period. Medicare policy stipulates that DME claims for items provided 2 or less days prior to a nursing home discharge to home are appropriate if the claim date and the discharge date are the same. We also took a conservative approach to possible

---

[29] OIG's Office of Audit Services routinely conducts audits relating to the issue of inappropriate Part B payments occurring during Part A stays. As such, we excluded these from our review.

INTRODUCTION

discharge locations by defining all discharges as home discharges and excluding these claims from analysis.

For the resulting identified 2006 DME claims allowed for Medicare beneficiaries during nursing home stays, we used OSCAR data to determine possible trends across the inappropriately allowed DME. Data utilized for trends included State, profit/nonprofit status, and the number of beds in nursing homes.

### Sampling To Verify Stay Date Accuracy and To Identify Level of Care for NFs and Distinct Part Nursing Homes

To test the validity of the identified stay dates using the MDS and to identify primary level of care, we randomly selected a sample of 300 beneficiaries from the 299,851 beneficiaries identified as having DME during non-Part A nursing home stays. Cumulatively, these 300 beneficiaries had 378 nursing home stays, received medical care in 311 different nursing homes,[30] and had 2,001 DME claims totaling approximately $280,896 allowed and $220,242 reimbursed by Medicare. The remaining dollars were paid by or on behalf of beneficiaries by third parties (i.e., Medicaid, supplemental insurance, or private resources). Using this sample, we surveyed the associated NFs and distinct part nursing homes to determine the proportion of each actually providing primarily a skilled level of care. This sample allowed us to project to the universe of DME provided during a NF or distinct part nursing home stay.

*Stay date accuracy*. We verified stay dates from the MDS by requesting admission and discharge date documentation directly from the nursing homes. The 378 stay dates determined from the MDS were nearly always accurate, with only 5 percent (21) of the reviewed stays having wrong or incomplete information.

*Level of care in NFs and distinct part nursing homes*. A NF or distinct part nursing home may qualify as a beneficiary's home if it provides a level of care less than skilled. CMS reported that it does not maintain information regarding primary level of care for NFs or distinct parts and indicated that States have the responsibility for maintaining this information. We subsequently contacted all State agencies in an attempt to determine the primary level of care provided by NFs.

---

[30] Of the sampled nursing homes, 216 were dually certified SNF/NFs, 9 were certified as SNFs, 21 as NFs, and 65 as having a distinct part.

INTRODUCTION

To determine the degree to which NFs and distinct part nursing homes provide primarily skilled care, we used OSCAR to identify the nursing homes in the previously described sample of 311 nursing homes that were NFs or distinct part nursing homes. There were 86 such nursing homes (21 NFs and 65 distinct part nursing homes). We asked nursing home administrators to respond to questions directly related to the administrative requirements for defining a skilled level of care.[31] (See Appendix C.) We received responses from 78 of the 86 nursing homes (91 percent).

Of the 14 responding NFs, 12 (86 percent) indicated that they provide primarily a skilled level of care; 63 of 64 (98 percent) responding distinct part nursing homes indicated that they provide primarily a skilled level of care. Based on this sample, NFs and distinct part nursing homes rarely (0.04 percent of the time) qualify as a beneficiary's home for DME payment purposes. Using this point estimate and sample statistics, we projected the dollars paid inappropriately to the universe of payments for DME during these stays.

### Reporting of Inappropriate DME Payments

For the findings of this report, we calculated inappropriately allowed DME using all of the 2006 DME claims submitted for Medicare beneficiaries during non-Part A nursing home stays. Specifically, the report findings are not adjusted to account for the small amount of errors resulting from our use of the MDS to determine nursing home stay dates. As mentioned previously, the results of our verification for a sample of stay dates during which DME was provided indicates that inaccuracies in the MDS stay date determinations rarely resulted in our misclassification of a DME claim during a nursing home stay as inappropriately allowed.

### Standards

This study was conducted in accordance with the "Quality Standards for Inspections" issued by the President's Council on Integrity and Efficiency and the Executive Council on Integrity and Efficiency (now Council of the Inspectors General on Integrity and Efficiency).

---

[31] CMS, SOM, chapter 2, § 2166; four specific criteria must be met fully to be considered engaged in providing primarily skilled care.

 **F I N D I N G S**

**Medicare Part B inappropriately allowed $30 million in 2006 for DME provided during non-Part A stays in Medicare-certified SNFs**

Suppliers received payments totaling $30,485,842 for the 309,626 DME claims allowed for Medicare beneficiaries during non-Part A stays in nursing homes certified as SNFs or dually certified as SNF/NFs. These claims were spread across 11,702 nursing homes. Since these nursing homes were providing primarily skilled care or rehabilitation, they could not be considered the beneficiaries' homes, a prerequisite for DME coverage. Medicare paid 77 percent ($23.4 million) of the allowed amount; the remaining 23 percent ($7.1 million) was paid by or on behalf of beneficiaries (i.e., Medicaid, supplemental insurance, or private resources).

**For 98 percent of the inappropriately allowed claims, suppliers incorrectly indicated that the DME provided during nursing home stays was for use in beneficiaries' homes**

For other claims, the places of service indicated by the suppliers were custodial homes (1.1 percent) or other places (1.2 percent), such as assisted living (0.8 percent), facilities for mentally retarded persons (0.3 percent), group homes (0.02 percent), and homeless shelters (0.01 percent).

**Wheelchairs and oxygen accounted for 72 percent ($22 million) of the inappropriately allowed DME payments**

The category of wheelchairs and related accessories represents the highest expense for inappropriately allowed DME (37 percent). (See Table 1 on the following page.) The category of oxygen and respiratory equipment and supplies accounts for the second-highest expense (35 percent).

**Rentals accounted for 76 percent of the total inappropriately allowed DME payments**

Additionally, oxygen, wheelchairs, and their related components accounted for $17.8 million (78 percent) of the $22.9 million inappropriately allowed for rentals and 191,805 of the 231,606 related claims. Hospital beds (and their related accessories) and decubitus care equipment accounted for 12 percent and 8 percent of the inappropriately allowed rental amount, respectively. In nearly all cases, an ongoing rental had been established prior to the nursing home stay. The resulting inappropriately paid amount occurred because the supplier failed to identify on submitted claims that the beneficiary had relocated to a nursing home and/or failed to change subsequent billing using the correct place of service code. We did not determine whether the beneficiary had provided the supplier with the information about the move to a nursing home.

F I N D I N G S

| Table 1:  Inappropriately Allowed Durable Medical Equipment Payments by Category | | |
|---|---|---|
| Category | Total Amount Inappropriately Allowed | Percentage of Amount Inappropriately Allowed* ($30,485,842) |
| Wheelchairs and related accessories | $11,395,901 | 37% |
| Oxygen and respiratory equipment and supplies | $10,562,263 | 35% |
| Hospital beds and related accessories | $3,910,113 | 13% |
| Decubitus care equipment | $2,122,838 | 7% |
| Seat/patient lifts | $828,853 | 3% |
| Other DME | $517,306 | 2% |
| Transcutaneous and/or neuromuscular electrical nerve stimulators | $486,851 | 2% |
| Walkers | $411,843 | 1% |
| Bath/commodes | $249,875 | 1% |

Source:  OIG analysis of DME payments in non-Part A stays during 2006.
*Percentages do not equal 100 percent because of rounding.

Medicare allowed more than $1 million for each of seven separate
HCPCS codes.  (See Table 2.)  Together, these items account for
73 percent ($22.2 million) of the total inappropriately allowed amount.
The HCPCS E1390 accounts for the single highest inappropriately paid
code, representing nearly 26 percent of the total inappropriately allowed
amount.  As indicated, most inappropriately allowed DME claims were
made for routine medical equipment (e.g., oxygen, beds, and
wheelchairs) that nursing homes could provide to their patients as part
of their daily rate.

| Table 2:  HCPCS With More Than $1 Million Inappropriately Allowed | | | |
|---|---|---|---|
| HCPCS | Item Description | Total Amount Inappropriately Allowed | Percentage of Amount Inappropriately Allowed ($30,485,842) |
| E1390 | Oxygen concentrator | $7,816,906 | 26% |
| E0260 | Hospital bed, semielectric | $3,536,488 | 12% |
| K0011 | Standard weight-frame motorized/power wheelchair | $3,184,235 | 10% |
| K0001 | Standard wheelchair | $2,191,881 | 7% |
| K0004 | Lightweight high-strength wheelchair | $2,112,417 | 7% |
| E0277 | Power pressure-reducing air mattress | $1,773,773 | 6% |
| K0003 | Lightweight wheelchair | $1,542,635 | 5% |

Source:  OIG analysis of DME payments in non-Part A stays during 2006.

F I N D I N G S

*The average inappropriate allowed amount associated with nursing homes was $2,605 with a median of $1,456.* Of the 11,702 nursing homes associated with beneficiaries having inappropriate DME payments, 3,637 (31 percent) exceeded the average. Further, 179 of these nursing homes were three or more standard deviations above the average, with the two highest totaling $102,875 and $73,227.

*The average inappropriate allowed amount for suppliers was $2,712 with a median of $906.* Of the 11,243 suppliers associated with inappropriate DME payments, 2,873 (26 percent) exceeded the average. Further, 137 of these suppliers were three or more standard deviations above the average, with the two highest totaling $248,340 and $200,382.

We analyzed the inappropriate allowed DME payments across several variables (e.g., geographic location, nursing home characteristics) and found no correlations between high payments and these variables. For example, 42 percent of the inappropriately allowed DME payments were made to suppliers in those States with a similar proportion of certified nursing home beds—California, Florida, New York, Ohio, Pennsylvania, and Texas.

**Nearly all of the additional $11.9 million that Medicare allowed for DME provided during non-Part A stays in Medicaid-certified NFs and distinct part nursing homes was inappropriate**

In 2006, suppliers received payments totaling $11.9 million for the 107,928 DME claims allowed for Medicare beneficiaries during stays in 3,373 nursing homes identified as NFs or as distinct part nursing homes. Medicare paid $9.2 million; the remaining $2.7 million was paid by or on behalf of beneficiaries (i.e., Medicaid, supplemental insurance, or private resources). Most DME claims (83 percent of the 107,928 claims) were made for beneficiaries residing in distinct part nursing homes.

Our conclusion that nearly all of the $11.9 million was paid inappropriately is based on the survey of a sample of these nursing homes to determine the extent to which they provide primarily skilled levels of care or rehabilitation services. Results indicate that nearly all of the sampled nursing homes provide primarily skilled care or rehabilitation.

Of the 78 nursing homes responding to our survey, 96 percent do not qualify as beneficiaries' homes for DME payment purposes. Specifically,

F I N D I N G S

12 of 14 NFs and 63 of 64 distinct part nursing homes provide primarily skilled care or rehabilitation. Utilizing this sample, the projected amount inappropriately paid was $11.2 million. The 95-percent confidence interval ranged from a low of $8.0 million to a high of $14.3 million.

As with non-Part A stays in SNFs and dually certified SNF/NFs, the inappropriately allowed DME in NFs and distinct part nursing homes were typically billed identifying the places of service as the beneficiaries' homes (97 percent), mostly for wheelchairs and oxygen (72 percent), and consisted mostly of rentals (78 percent).

**CMS and States do not maintain a primary level of care designation for nursing homes that could facilitate accurate claim submission by suppliers and proper claim adjudication by payment contractors**

When suppliers prepare DME claims or claims are processed for payment by DME MACs, it is important that the appropriate place of service codes be utilized. However, suppliers that code place of service and MACs that adjudicate claims do not have ready access to the primary level of care status of NFs and distinct part nursing homes unless this information is provided directly by these facilities. The lack of access to this information results from CMS or States not making these determinations and maintaining results in an accessible database. CMS reported that it does not maintain information regarding primary level of care for NFs and distinct parts and indicated that States have the responsibility for maintaining this information. We contacted all State agencies in an attempt to determine the primary level of care provided by NFs and distinct part nursing homes. Twenty-one States require that nursing homes licensed in their States provide primarily skilled care or rehabilitation. Of these 21 States, 13 have statutes that specifically require this level of care for State licensure. In the remaining 29 States, there may be nursing homes that do not provide primarily skilled care or rehabilitation, or include a distinct part that does not provide primarily skilled care or rehabilitation.

# ► R E C O M M E N D A T I O N S

When setting DME payment policy, Congress recognized the responsibility of institutions to meet patients' medical needs, regardless of the primary payer for the stays (i.e., Medicare, Medicaid, or private resources). Consequently, each nursing home must provide DME as an integral part of its basic daily rate unless it is not providing primarily skilled care or rehabilitation. Yet, very few nursing homes provide care lower than skilled. Although payment contractors routinely deny DME payment for claims submitted with a nursing home place of service designation, an incorrect place of service designation (i.e., home) results in inappropriate payment. Past OIG studies have highlighted this issue; however, payment controls are still insufficient to stop inappropriate DME payments.

To address inappropriate payments, we recommend that CMS:

**Use electronic resident assessment data contained in the MDS to establish a routine process to periodically (e.g., annually) generate a list of non-Part A beneficiary stays in nursing homes that provide primarily skilled care or rehabilitation.** CMS should then direct contractors to identify and recover inappropriate DME payments. Further, CMS should direct contractors to identify suppliers that repeatedly submit incorrect place of service on DME claims and forward such information to the OIG Office of Investigations.

**Implement a process or processes to identify patients entering nursing homes with rented DME.** Nursing homes could use this information to alert suppliers of the beneficiary's change of address.

**Determine which NFs and distinct part nursing homes provide primarily skilled care, thus not qualifying as a beneficiary's home for DME payment purposes.** State Medicaid agencies and CMS do not evaluate and maintain this information. At a minimum, CMS could require State Medicaid agencies to make the determination using the available CMS administrative criteria. This designation should then be available to claims processors, nursing homes, and suppliers.

**Direct contractors to recoup the inappropriate payments identified in this report.** We will forward claim-specific information to CMS under separate cover.

RECOMMENDATIONS

## AGENCY COMMENTS AND OFFICE OF INSPECTOR GENERAL RESPONSE

CMS concurred with our recommendations to establish a routine process to periodically identify non-Part A stays using MDS and to recover inappropriate payments identified in this study. The draft report also recommended that CMS (1) expand the resident assessment process to identify whether the patient entered the nursing home with DME and (2) use the Online Survey Certification and Reporting system (OSCAR) to determine and report which NFs and distinct part nursing homes qualify as beneficiary homes for DME payment purposes. Although agreeing with the underlying objectives of these two recommendations, CMS suggested alternative approaches using claims processing edits to address them.

We agree that other methods may achieve the same objectives, so we have made changes to the recommendations. Rather than prescribe the needs assessment as the tool for identifying DME, this final report recommends only that CMS implement a process or processes for this purpose. Also, we removed reference to OSCAR as the method that CMS should use to determine and disseminate information on the home status of NFs and distinct part nursing homes.

We defer to CMS on the appropriate methods to address these recommendations. In the comments on the draft report, CMS suggests that claims processing edits could address the recommendations, but no details were provided on how such edits would work. We ask that CMS provide this information in its final management decision.

For the full text of CMS's comments, see Appendix D.

 **A P P E N D I X   A**

**MEDICARE LEARNING NETWORK MATTERS
ARTICLE SE0745 REPRINTED\***
**Skilled Nursing Facility Definition Used To Determine Durable Medical
Equipment Coverage and in Ending a Benefit Period or Spell of
Illness**[32]

\*Italics in document added for emphasis; abbreviations used to save space.

Coverage of a beneficiary's skilled nursing facility (SNF) stay under
Part A (the Original Medicare plan's hospital insurance program)
encompasses the overall package of institutional care that the SNF
furnishes during the course of the beneficiary's Medicare-covered stay.
This comprehensive Part A coverage includes durable medical
equipment (DME) under the heading of ". . . drugs, biologicals, supplies,
appliances, and equipment . . ." as stated in § 1861(h)(5) of the Social
Security Act (the Act).[33]

When a beneficiary's SNF stay does not qualify for Part A coverage
(no qualifying three-day hospital stay, SNF level of care not met, etc.),
Part B (the supplementary medical insurance program) generally can
still provide limited coverage for certain individual "medical and other
health services" described in § 1861(s) of the Act.  However, as
explained below, the scope of coverage under the Part B benefit for DME
(§ 1861(s)(6) of the Act) specifically excludes items that are furnished for
use in the SNF setting.

- Section 1861(n) of the Act limits Part B coverage under the DME
  benefit to those items that are furnished for use in a beneficiary's
  home.  This provision further specifies that *any institution
  meeting the basic definition of a hospital in § 1861(e)(1) of the Act,
  or of an SNF in § 1819(a)(1) of the Act, cannot be considered a
  patient's "home" for this purpose.*  Section 1819(a)(1) of the Act
  (formerly § 1861(j)(1) of the Act), in turn, defines a "SNF" broadly
  as any institution that is engaged primarily in providing skilled

---

[32] Centers for Medicare & Medicaid Services (CMS), "Medicare Learning Network Matters,
Article #SE0745," October 25, 2007. Available online at
http://www.cms.hhs.gov/MLNMattersArticles/2007MMAN/itemdetail.asp?filterType=none&filterByDID
=99&sortByDID=8&sortOrder=ascending&itemID=CMS1204646&intNumPerPage=10. Accessed on
May 6, 2008.

[33] The Act can be accessed online at http://www.ssa.gov/OP_Home/ssact/ssact-toc.htm.
Accessed in June 2008.

A P P E N D I X      A

nursing (clause (A)) or rehabilitation services (clause (B)) to its residents.

- This expansive SNF definition omits the specific, more restrictive elements contained in the remainder of §§ 1819(a)-(d) of the Act, which list the detailed requirements that an institution must meet in order to participate in the Medicare program as a certified SNF. Thus, *in excluding Part B coverage for DME furnished in "SNFs" as defined broadly in § 1819(a)(1) of the Act, Congress intended for this exclusion to encompass not only all Medicare-participating SNFs, but also any other institutions which, though not participating in Medicare, do provide the type of care described in that section of the law.*[34]

- The blanket prohibition that Congress imposed on any separate Part B payment for DME furnished in this setting (see § 144(d) of the Social Security Amendments of 1967, P.L. No. 90-248) would appear to reflect the view that any institution whose primary function is to provide skilled care to its residents would have an inherent responsibility to dispense DME, when needed. This would mean that payment for such items is already an integral part of the skilled facility's basic inpatient rate. Accordingly, any separate, additional DME payment under Part B in this situation would be redundant. Modifying or eliminating the statutory prohibition on Part B payment for DME furnished in this setting would require legislation to amend the law itself.

**Additional Considerations for DME Furnished in Medicaid-Only Nursing Facilities**

Additional considerations apply in determining whether a Medicaid-only nursing facility (NF) would meet the basic SNF definition in this context. Medicaid NFs were created when the Omnibus Budget Reconciliation Act of 1987 (OBRA 1987) enacted nursing home reform legislation that combined the previously separate Medicaid categories of SNFs and intermediate care facilities (ICF) into a single category. Prior to the OBRA 1987 changes, Medicaid SNFs were *always* considered to meet the law's basic definition of a SNF, while pursuant to a U.S. District Court decision in Kron v. Heckler (E.D. La., October 17, 1983),

---

[34] This policy is also reflected in the regulations in title 42 CFR § 410.38(b) and in CMS's "Medicare Benefit Policy Manual," chapter 15, § 110.1.D. Available online at http://www.cms.hhs.gov/manuals/iom/list.asp. Accessed in June 2008.

APPENDIX   A

those facilities licensed or certified solely as ICFs were *never* considered to meet the basic SNF definition.

- The parallel Medicare SNF and Medicaid NF definitions that OBRA 1987 established in §§ 1819(a)(1) and 1919(a)(1) of the Act, respectively, both turn on the type of care that the facility is engaged primarily in furnishing.  However, while the NF definition in § 1919(a)(1) of the Act contains a clause (A) for skilled nursing and a clause (B) for rehabilitation services that are identical to their SNF counterparts in § 1819(a)(1) of the Act, it also contains an additional clause (C) for health-related institutional care above the level of room and board (comparable to the type of care furnished by intermediate care facilities (ICF) prior to OBRA 1987), which is not found in the SNF definition.

- Thus, *if a Medicaid NF is engaged primarily in furnishing skilled care under either clauses (A) or (B) of § 1919(a)(1) of the Act, it would meet the basic SNF definition and cannot be considered a "home" for purposes of DME coverage under Part B.*  Alternatively, if the NF is engaged primarily in furnishing essentially ICF-level care under clause (C) of this provision, it would not meet the basic SNF definition and can be considered a home for DME coverage purposes.  Thus, because some NFs meet the basic SNF definition while others do not, NFs cannot, as a class, automatically be regarded as either qualifying or not qualifying as a "home" for DME coverage purposes and, therefore, must be evaluated individually under the administrative criteria discussed below.

**Administrative Criteria**

Administrative criteria to identify those institutions that meet the basic SNF definition are used by each of the State agencies that survey the individual institutions within their jurisdictions.[35]  These criteria also were published in the Federal Register as Health Care Financing Administration Rulings 83-2 (47 FR 54551, December 3, 1982) and 83-3 (49 FR 10710, March 22, 1984).  Historically, it has been the State survey agency's responsibility to evaluate an institution in terms of these criteria.  This evaluation reflects the type of care that the institution provides to its residents generally (rather

---

[35] CMS, "State Operations Manual" (SOM), chapter 2, § 2166.  Available online at http://www.cms.hhs.gov/manuals/downloads/som107c02.pdf.  Accessed in June 2008.

A P P E N D I X   A

than the type of care that an individual resident may be receiving at a given point in time), because the requirements of the law relate to the type of care that an institution is engaged primarily in providing to its overall resident population.

- Further, States can choose to incorporate the requirements of § 1819(a)(1) of the Act directly into their own facility licensure standards as seen in CMS's SOM, chapter 2, § 2164. In a State that elects to adopt this approach, simply ascertaining that a particular nursing home is licensed under the applicable facility category of State law can also serve to confirm that the facility meets the basic SNF definition in § 1819(a)(1) of the Act.

**Applying the Criteria in Institutions That Contain a Participating "Distinct Part"**

- Generally, the determination of whether an institution meets the basic SNF definition is made by evaluating it as a single unit rather than by separately evaluating and classifying individual areas within the institution. In order to categorize a particular portion of an institution separately from the remainder of that institution, it is necessary for that portion to constitute a "distinct part" (e.g., a separate, physically identifiable unit consisting of all the beds in a particular building, floor, wing, or ward). (See the regulations at 42 CFR 483.5(b).)

- In this situation, if the participating distinct part of an institution meets the basic SNF definition and the remainder of the institution does not, DME payment would be available under Part B only in the portion of the institution that qualifies as a "home" for DME coverage purposes by virtue of not meeting the basic SNF definition. Part B payment would not be available for DME furnished in any part of the institution that is identified as meeting the basic SNF definition, regardless of the type of care that a particular resident may be receiving there.

A more detailed discussion of situations in which part of an institution meets the basic SNF definition and part of it does not appears in chapter 5, § 1 of the "Medicare Program Integrity Manual," also available online at http://www.cms.hhs.gov/manuals/iom/list.asp on the CMS Web site. This is the same material that originally appeared in § 4105.1 of the "Medicare Carriers Manual," Part 3 (CMS Publication 14-3).