A P P E N D I X   B

## DURABLE MEDICAL EQUIPMENT BILLING CODES
## INCLUDED IN THE EVALUATION

| HCPCS Codes* | Categories |
|---|---|
| E0100–E0105 | Canes |
| E0110–E0118, E0153 | Crutches and related accessories |
| E0130–E0159 | Walkers |
| E0160–E0175, E0240–E0249, E0968 | Bath/commode and related accessories |
| E0180–E0199, E0277, E0370–E0373 | Decubitus care equipment |
| E0200–E0239, E0249 | Hot/cold applications |
| E0250–E0373, E0462 | Hospital beds and related accessories |
| E0424–E0601, E0605, E0618–E0619, E1353–E1406, K0730–K0738 | Oxygen and respiratory equipment and supplies |
| E0607 | Blood glucose monitor |
| E0610–E0620 | Pacemaker monitor and defibrillator |
| K0606–K0609 | Defibrillator accessories |
| E0621–E0642 | Patient lifts, standing devices/lifts |
| E0650–E0675 | Pneumatic compressor and appliances |
| E0720–E0769 | Transcutaneous and/or neuromuscular electrical nerve stimulators |
| E0776 (without BA modifier)–E0791, K0455, E1520, K0552, K0601–K0605 | Infusion pump for medications and related supplies |
| E0830–E0900 | Traction equipment |
| E0910–E0948, E0951–E0952 | Trapeze equipment, fracture frame, other orthopedic devices |
| E0955–E1298, K codes | Wheelchairs and related accessories |
| E1340 | Repairs and replacements |
| E1700–E1702 | Jaw motion rehabilitation system and accessories |

* Healthcare Common Procedure Coding System (HCPCS) codes listed within ranges are in specified categories, except as specified elsewhere.

► A P P E N D I X   C

## DEFINING PRIMARY LEVEL OF CARE

To identify the primary level of care provided by nursing facilities (NF) and nursing homes with distinct parts, we utilized our sample of 311 nursing homes. Of the 311 nursing homes, 65 were identified through CMS's Online Survey, Certification, and Reporting system as distinct part nursing homes and 21 were certified as NFs. We contacted these 86 nursing homes to determine the primary level of care that they provided, independent of their certification status; 78 responded. We asked each nursing home to tell us whether it met the following four criteria identified in the "State Operations Manual" (SOM) maintained by the Centers for Medicare & Medicaid Services (CMS):

- One or more nurses (registered nurses or licensed practical or vocational nurses) direct or supervise nursing services without regard to whether the facility has the nurse staffing requirement "waived." (SOM § 2166A.)

- Nursing personnel are on duty 24 hours a day. (SOM § 2166B.)

- The number of full-time-equivalent nursing personnel to the number of beds is at least an average ratio of 1 to 15 per shift. (SOM § 2166C.)

- Other services (e.g., bed and board) are provided to inpatients in connection with the furnishing of nursing care, plus one or more medically related health services (e.g., physician's services; physical, occupational, or speech therapy; diagnostic and laboratory services; and administration of medication). (SOM § 2166D.)

If a nursing home indicated in all four instances that it met the criteria, we determined that the facility engaged primarily in providing a skilled level of care.

These four criteria are those identified as CMS's "Administrative Criteria for Identifying Facilities That Meet 1819(a)(1)."[36] Section 1819(a)(1) of the Act discusses nursing services. This section also contains the statutory definition of a skilled nursing facility (SNF), which is the basis for Medicare certification requirements of SNFs in 42 CFR 483, subpart B. In many States, licensing laws for all nursing

---

[36] CMS, SOM. Available online at http://www.cms.hhs.gov/manuals/downloads/som107c02.pdf. Accessed in June 2008.

APPENDIX   C

homes have incorporated the requirements of § 1819(a) or § 1919(a) of
the Act or the criteria contained in § 2166.  When this is the case, any
nursing home licensed in such States cannot be considered a resident's
home for purposes of spell of illness, durable medical equipment,
ambulance, and home health benefits.  In other States, it may be
necessary for the State agency to make § 1861(e)(1) or § 1819(a)(1)
certifications.  As indicated, SNFs meet § 1819(a)(1) requirements, as do
long-term-care nursing homes in States where licensure laws require it.
In other situations, a facility or a part of a facility meets the standard
set forth in § 1819(a)(1) of the Act for purposes of determining skilled
level of care if the nursing home meets each of the four criteria listed on
the previous page.

◤ **A P P E N D I X   D**

## AGENCY COMMENTS

 DEPARTMENT OF HEALTH & HUMAN SERVICES          Centers for Medicare & Medicaid Services

260 Independence Avenue SW
Washington, DC 20201

**DATE:**     APR 1 0 2009

**TO:**       Daniel R. Levinson
             Inspector General

**FROM:**     *Charlene Frizzera*
             Charlene Frizzera
             Acting Administrator

**SUBJECT:**  Office of Inspector General (OIG) Draft Report: "Part B Services During
             Non-Part A Nursing Home Stays: Durable Medical Equipment" OEI-06-
             07-00100

Thank you for the opportunity to review and comment on the above-referenced OIG draft report.

Medicare Part A covers nursing home care for a beneficiary's stay up to 100 days in a skilled nursing facility (SNF). If nursing home care is still needed after the 100 days or the beneficiary does not qualify for Part A SNF stay, Medicare Part B may provide coverage for certain medical and other health services. However, Part B does not pay for durable medical equipment (DME) provided during a nursing home stay unless the nursing home qualifies as a beneficiary's home.

The OIG found that Medicare Part B allowed inappropriate payments of $30 million in 2006 for DME provided during non-Part A stays in Medicare-certified SNFs. Medicare Part B inappropriately allowed payment of $23.4 million in 2006 for DME provided during non-Part A stays in Medicare-certified SNFs and $7.1 million was paid by or on behalf of beneficiaries (i.e., Medicaid, supplemental insurance or private resources). For 98 percent of the claims in the OIG sample, suppliers incorrectly indicated that DME was for use in the beneficiary's home. Of the $23.4 million in inappropriate payments, $22.9 million of the DME payments were for rentals for which there are payment limitations upon a beneficiary's nursing home admission.

The OIG made the following recommendations:

**OIG Recommendation**

Use electronic resident assessment data contained in the Minimum Data Set (MDS) to establish a routine process to periodically (e.g., annually) generate a list of non-Part A beneficiary stays in nursing homes that provide primarily skilled care or rehabilitation.

A P P E N D I X   D

Page 2 – Daniel R. Levinson

**CMS Response**

We concur with the recommendation.  CMS will seek to provide Medicare Recovery Audit Contractors access to the MDS data for the purpose of periodically checking whether beneficiaries who received Part B DME services were residents of nursing homes that do not qualify as a beneficiary's home.

**OIG Recommendation**

Expand the resident assessment process to identify whether the patient entered the nursing home with the DME and whether it is owned or rented by the beneficiary.

**CMS Response**

We agree with the underlying objective of increasing the available data on DME usage in nursing homes.  However, we do not concur with this recommendation as it is currently structured.  We are concerned that the recommended approach essentially proposes to achieve this objective through a clinical vehicle that is not well-suited to this purpose.  The MDS is a clinically-based assessment tool used to determine patients' health, physical functioning, and medical conditions.  In addition, the MDS is completed by an interdisciplinary clinical team whose primary focus is care planning.  As a result, we do not see the MDS as an effective mechanism for the accurate collection of an inventory of the patients' DME, including status of ownership.  Instead, CMS will explore the feasibility of creating a claims processing system edit that would prevent improper payments for DME furnished to beneficiaries during a non-Part A nursing home stay.

**OIG Recommendation**

Determine which nursing facilities (NFs) and distinct part nursing homes qualify as a beneficiary's home for DME payment purposes and maintain this designation in Online Survey, Certification, and Reporting (OSCAR) system.

**CMS Response**

We agree with the underlying objective to explore ways to determine whether a nursing home serves as a resident's home for the purposes of making proper DME payments; however, we do not concur with this recommendation.  OIG's recommendation seeks to use the OSCAR system as a way to designate NFs or distinct part nursing homes that qualify as a beneficiary's home.  The OSCAR database's fundamental purpose is directed toward facility level survey and certification information.  The determination of whether the nursing home is really a specific beneficiary's home is individualized to the beneficiary's coverage for payment purposes.  Consequently, individual designation of whether a given nursing home is a beneficiary's home may not be best located in OSCAR.  However, consistent with the rationale offered in our response to Recommendation 2, there may be alternative approaches considered by CMS for a claims processing edit to prevent improper DME payments.

APPENDIX D

Page 3 – Daniel R. Levinson

**OIG Recommendation**

Direct contractors to recoup the inappropriate payments identified in this report.

**CMS Response**

We agree that the inappropriate payments (subject to verification by the Medicare contractors) should be recovered. CMS plans to recover the overpayments identified consistent with the Agency's policies and procedures.

The OIG will be required to furnish, for each overpayment or potential overpayment, the data necessary (Medicare contractor numbers, provider numbers, claims information including the paid date, HIC numbers, etc.) to initiate and complete recovery action. In addition, Medicare contractor-specific data should be written to separate CD-ROMs or separate hardcopy worksheets in order to better facilitate the transfer of information to the appropriate contractors.

# ◤ A C K N O W L E D G M E N T S

This report was prepared under the direction of Kevin K. Golladay, Regional Inspector General for Evaluation and Inspections in the Dallas regional office, and A. Blaine Collins, Deputy Regional Inspector General.

Leah K. Bostick served as the team leader for this study, and Dana McClellen served as lead analyst. Other principal Office of Evaluation and Inspections staff from the Dallas regional office who contributed to the report included Petra Johansson, Margaret Knight, Sai Loganathan, and Jeremy Moore; central office staff who contributed include Robert L. Gibbons, Scott Horning, Jennifer Jones, and Sandy Khoury.

**EXHIBIT B**

# Medicare Claims Processing Manual
## Chapter 20 - Durable Medical Equipment, Prosthetics, Orthotics, and Supplies (DMEPOS)

**Table of Contents**
*(Rev. 2977, 06-20-14)*

<u>**Transmittals for Chapter 20**</u>

01 - Foreword

10 - Where to Bill DMEPOS and PEN Items and Services

    10.1 - Definitions

        10.1.1 - Durable Medical Equipment (DME)

        10.1.2 - Prosthetic Devices - Coverage Definition

        10.1.3 – Prosthetics and Orthotics (Leg, Arm, Back, and Neck Braces, Trusses, and Artificial Legs, Arms, and Eyes) - Coverage Definition

        10.1.4 - Payment Definition Variances

            10.1.4.1 - Prosthetic Devices

            10.1.4.2 - Prosthetic and Orthotic Devices (P&O)

    10.2 - Coverage Table for DME Claims

    10.3 - Beneficiaries Previously Enrolled in Managed Care Who Return to Traditional Fee for Service (FFS)

20 - Calculation and Update of Payment Rates

    20.1 - Update Frequency

    20.2 - Locality

    20.3 - Elimination of "Kit" Codes and Pricing of Replacement Codes

    20.4 - Contents of Fee Schedule File

    20.5 - Online Pricing Files for DMEPOS

30 - General Payment Rules

    30.1 - Inexpensive or Other Routinely Purchased DME

        30.1.1 - Used Equipment

        30.1.2 - Transcutaneous Electrical Nerve Stimulator (TENS)

    30.2 - Items Requiring Frequent and Substantial Servicing

        30.2.1 - Daily Payment for Continuous Passive Motion (CPM) Devices

    30.3 - Certain Customized Items

Section 1834(h)(1)(G) of the Act, "Replacement of Prosthetic Devices and Parts," refers to prosthetic devices that are artificial limbs. Section 1861(s) of the Act, which defines "medical and other health services," does not define artificial limbs as "prosthetic devices" (§1861(s)(8)). Rather, artificial limbs are included in the §1861(s)(9) category, "orthotics and prosthetics." When discussing replacement, these instructions will use the term "prosthetic device" as intended by §1834(h)(1)(G), i.e., artificial limbs.

## 10.1.4.2 - Prosthetic and Orthotic Devices (P&O)
**(Rev. 1, 10-01-03)**

Except as specifically noted (e.g., IOLs), when discussing payment and other policies, instructions in this chapter will use the terms "prosthetic and orthotic devices" and the abbreviation "P&O" interchangeably to refer to both §1861(s)(8) and (9) services.

## 10.2 - Coverage Table for DME Claims
**(Rev. 1, 10-01-03)**
**B3-2105**

Reimbursement may be made for expenses incurred by a patient for the rental or purchase of durable medical equipment (DME) for use in his/her home provided that all the conditions in column A below have been met. Column B indicates the action contractors will take to establish that the conditions have been met.

| A - Conditions | B - Review Action |
|---|---|
| 1. Payment may be made for the following: | 1. Payment may be made for following: |
| (a) Items of DME that are medically necessary | (a) The HCPCS file shows coverage status of items. If item is not listed in the HCPCS file, the contractor will develop LMRP to determine whether the item is covered. |
| (b) Separate charges for repair, maintenance and delivery | (b) Repairs - only if DME is being purchased or is already owned by patient and repair is necessary to make the equipment serviceable. Medicare pays the least expensive alternative. (See special exception in Chapter 15 of the Medicare Benefit Policy Manual for repair of dialysis delivery system.)<br><br>NOTE: See Chapter 15 of the Medicare Benefit Policy Manual for handling claims suggesting deliberate or malicious damage or destruction. |

| A - Conditions | B - Review Action |
|---|---|
| | Maintenance - only if the equipment is being purchased, or is already owned by the patient, and if the maintenance is extensive amounting to repairs, i.e., requiring the services of skilled technicians. (Contractors deny claims for routine maintenance and periodic servicing, e.g., testing, cleaning, checking, oiling, etc.) (See special exception in Chapter 15 of the Medicare Benefit Policy Manual for maintenance of dialysis delivery system.)<br><br>Delivery - of rented or purchased equipment is covered, but the related payment is included in the fee schedule for the item. Additional payment may be made at the discretion of the contractor in special circumstances (see Chapter 15 of the Medicare Benefit Policy Manual) |
| (c) Separate charges for disposable supplies, e.g., oxygen, if essential to the effective use of medically necessary durable medical equipment.  Separate charges for replacement of essential accessories such as hoses, tubes, mouthpieces, etc., only if the beneficiary owns or is purchasing durable medical equipment (BPM, Chapter 15, §110). (Medications used in connection with durable medical equipment are covered under certain conditions - see Chapter 15 of the Medicare Benefit Policy Manual) | (c) Claim must indicate that:<br><br>• The patient has the DME for which the supply is intended;<br><br>• The DME continues to be medically necessary; and<br><br>• The items are readily identifiable as the type customarily used with such equipment.<br><br>**NOTE:** If the quantity of accessories and/or supplies included in a claim seems excessive or if claims for such items are received from the same claimant with undue frequency, see Chapter 5 of the Medicare Program Integrity Manual. |
| 2.  DME must be for use in patient's residence other than a health care institution.  (BPM §110.3 & PIM, Chapter 5, §1) | 2.  Payment cannot be made for equipment for use in an institution classified as:<br><br>a.   A participating hospital,<br><br>b.   An emergency hospital, |

| A – Conditions | B – Review Action |
|---|---|
| | c.  Meets §1861(e)(1) of the Act, |
| | d.  A participating SNF or |
| | e.  Meets §1819(a)(1) of the Act. |
| | Except for a distinct part of a SNF, if one of these institutions has a distinct part that does not meet 1819(a)(1), the patient may be considered in his/her residence if he/she was physically located in such distinct part during the use period. |
| | DMEPOS (DME, P&O, and supplies) items provided to hospice patients are generally included in the payment for hospice services.  Items of DMEPOS are covered by Medicare and paid in addition to the hospice payment only when those items or supplies are provided to the patient for treatment of a condition or illness not related to the patient's terminal illness. |
| 3.  Physician's prescription required. | A supplier must maintain and, upon request, make available to the contractor, the detailed written order (or, when required, the Certificate of Medical Necessity (CMN)) from the treating physician.  See the Medicare Program Integrity Manual, Chapter 5. |

## 10.3 – Beneficiaries Previously Enrolled in Managed Care Who Return to Traditional Fee for Service (FFS)
**(Rev. 1, 10-01-03)**
**B3-9051**

When a beneficiary who was previously enrolled in a Medicare HMO/Managed Care program returns to traditional FFS, he or she is subject to all benefits, rules, requirements and coverage criteria as a beneficiary who has always been enrolled in FFS.  When a beneficiary returns to FFS, it is as though he or she has become eligible for Medicare for the first time.  Therefore, if a beneficiary received any items or services from their HMO or Managed Care plan, they may continue to receive such items and services only if they would be entitled to them under Medicare FFS coverage criteria and documentation requirements.

# EXHIBIT C

## Explanation of the Decision

Claim Number:14045827497002

Payment can be allowed.

At issue is payment for a tilt-in-space wheelchair and related accessories.

Internet Only Manual (IOM) 100-4 Chapter 6, Durable Medical Equipment, Prosthetics, Orthotics, and Supplies (DMEPOS), states that Medicare does not make separate payment for DMEPOS when a beneficiary is in the institution and will be considered if the DME benefit is meant only for items a beneficiary is using in his or her home.

The Medicare Claims Processing Manual, Publication 100-04, Chapter 20, Section 01 states a covered stay for skilled nursing facility (SNF) inpatients are included in the inpatient prospective payment system (PPS) and are not separately billable. Before dispensing durable medical equipment and supplies, supplies have access to determine whether or not a beneficiary is in an inpatient stay on the date of service the service/item is provided. A supplier may access the Interactive Voice Recognition (IVR) telephone line to inquire about status.

The DME MAC denied payment, because the beneficiary was an inpatient in a Part A facility / SNF at the time of service in question.

The Qualified Independent Contractor (QIC) performed an independent review. Medicare records indicate the beneficiary was not an inpatient / covered under a SNF stay at the time the service was rendered. Based on the available documentation, the requirements of the IOM and Claims Processing Manual have been met. Therefore, Medicare may process this claim.

In conclusion, the decision of the QIC is favorable.

## Who is Responsible for the Bill?

We have determined the beneficiary was not enrolled in a SNF / Part A stay on the date of service in review. Medicare will process the claim and the Medicare Affiliated Contractor (MAC) will determine claim payment for the specific service(s) at issue.

## Other Important Information

If you appeal this decision the Administrative Law Judge (ALJ) will not consider new evidence unless you show good cause for not presenting the evidence to the QIC.  This requirement does not apply to beneficiaries, unless a provider or supplier represents the beneficiary.

## Summary of Facts

The service(s) shown below were submitted for payment to National Government Services, Inc.. The explanation of the decision was released in a Medicare Summary Notice to the beneficiary and a Remittance Advice to the provider of service. A request for a redetermination appeal was submitted to the Medicare contractor. On May 16, 2014, National Government Services, Inc. completed the appeal, and sent notice of the decision to the appropriate parties. On June 02, 2014, we received a QIC reconsideration request for the services referenced in the "Appeal Details" section. Records contained in the case file included:

- Detailed Product Description (DPD)
- Redetermination Letter
- Proof of Delivery (POD)
- Physician Order/Prescription (RX)
- Physician Medical Record(s)
- Overpayment Letter
- Reconsideration Request
- Physician Progress Note(s)

## Decision

The decision on your appeal is shown below:

| Medicare Coverage | Claim Number (ICN) | Procedure /Date of Service |
|---|---|---|
| Covered | 14045827497002 | E1161: Manual Adult Wc W Tiltinspac - (02/13/14) |
| | | E2231: Solid Seat Support Base - (02/13/14) |
| | | E2607: Skin Pro/Pos Wc Cus Wd <22in - (02/13/14) |
| | | E2620: Wc Planar Back Cush Wd <22in - (02/13/14) |
| | | E0955: Cushioned Headrest - (02/13/14) |
| | | E1028: W/C Manual Swingaway - (02/13/14) |
| | | E0973: W/Ch Access Det Adj Armrest - (02/13/14) |
| | | E0990: Wheelchair Elevating Leg Res - (02/13/14) |
| | | K0040: Adjustable Angle Footplate - (02/13/14) |
| | | K0039: Leg Strap H Style Each - (02/13/14) |
| | | E0971: Wheelchair Anti-Tipping Devi - (02/13/14) |
| | | E0978: W/C Acc,Saf Belt Pelv Strap - (02/13/14) |
| | | E0973: W/Ch Access Det Adj Armrest - (02/13/14) |

Notice of payment will be issued by National Government Services, Inc..

| Medicare Appeal Number: |
|---|
| 1-2424524844 |

## Appeal Details

| Beneficiary | ▓▓▓▓ - ******▓▓▓▓ |
|---|---|
| Provider | Cair Medical INC |

| Claim Number | Date of Service | Procedure | Medicare QIC Decision |
|---|---|---|---|
| 14045827497002 | 02/13/14 | E2231: Solid Seat Support Base | Favorable |
| | 02/13/14 | E2607: Skin Pro/Pos Wc Cus Wd <22in | Favorable |
| | 02/13/14 | E2620: Wc Planar Back Cush Wd <22in | Favorable |
| | 02/13/14 | E0955: Cushioned Headrest | Favorable |
| | 02/13/14 | E1028: W/C Manual Swingaway | Favorable |
| | 02/13/14 | E0973: W/Ch Access Det Adj Armrest | Favorable |
| | 02/13/14 | E0990: Wheelchair Elevating Leg Res | Favorable |
| | 02/13/14 | K0040: Adjustable Angle Footplate | Favorable |
| | 02/13/14 | K0039: Leg Strap H Style Each | Favorable |
| | 02/13/14 | E0971: Wheelchair Anti-Tipping Devi | Favorable |
| | 02/13/14 | E0978: W/C Acc,Saf Belt Pelv Strap | Favorable |
| | 02/13/14 | E0973: W/Ch Access Det Adj Armrest | Favorable |
| | 02/13/14 | E1161: Manual Adult Wc W Tiltinspac | Favorable |

THIS IS NOT A BILL – Keep this letter or a copy for your records.



For information on how to appeal this decision, refer to the page titled "Important Information About Your Appeal Rights." If you need more information or have any questions, please call 1-800-Medicare (1-800-633-4227) [TTY/TDD: 1-800-486-2048] or the phone number listed on page one.

You can receive copies of statutes, regulations, policies, and/or manual instructions we used to arrive at this decision. For instructions on how to do this, please see 'Other Important Information' on the page entitled "Important Information About Your Appeal Rights." The request must be submitted in writing to this office.

**C2C Solutions, Inc.**
P.O. Box 44163, Jacksonville, Florida 32231-4163
www.C2CInc.com
Revision date 04/03/2013

# EXHIBIT D



Department of Health and Human Services
OFFICE OF MEDICARE HEARINGS AND APPEALS
Western Field Office
Irvine, California

| | | |
|---|---|---|
| Appeal of: | CAIR MEDICAL | ALJ Appeal No.: 1-979572781 |
| Beneficiary: | ▆▆▆▆▆ | Medicare Part: B |
| HICN: | *****▆▆▆ | Before: Richard Bush |
| | | U.S. Administrative Law Judge |

## DECISION

After careful consideration of the evidence and arguments presented in the record and at the hearing a FULLY FAVORABLE decision is entered for Cair Medical, (the "Appellant").

## Procedural History

The Appellant submitted claims to Medicare for payment of a Manual Adult Tilt-in-Space Wheelchair (E1161), a Solid Seat Support Base (E2281), a 22" wide Wheelchair Cushion (E2601), a 22" inch wide Back Cushion (E2611), A Cushioned Headrest (E0955), Manual Swingaway (E1028), Adjustable Detachable Armrests (E0973), Elevating Leg Rests (E0990), an Adjustable Footplate (K0040), a Heel Loop (E0951), a Wheelchair component (K0108), an Anti-tipping Device (E0971), Safety Belt (E0978), and Elevated Leg Rest (K0046) provided to ▆▆ ▆▆▆▆ (the "Beneficiary"), on October 5, 2011.[1] (Exh. 21) Noridian Administrative Services, (the "Medicare Contractor"), denied payment on initial determination and redetermination. (Exh. 23)

The Appellant subsequently filed a request for reconsideration with C2C Solutions, Inc., a Qualified Independent Contractor, (the "QIC"). (Exh. 24) The QIC affirmed the Medicare Contractor's unfavorable determination and held that the Appellant was liable for the non-covered services. (Exh. 26)

The Office of Medicare Hearings and Appeals, ("OMHA"), received the Appellant's timely filed request for an Administrative Law Judge ("ALJ") hearing. (Exh. 27) The remaining amount in controversy meets the jurisdictional requirements for a hearing before OMHA. (42 C.F.R. § 405.1006). On January 17, 2013, a Notice of Hearing was sent to the Appellant, the Beneficiary, the Medicare Contractor, and MAXIMUS Federal Services. (Exh. 28) The Medicare Contractor submitted a pre-hearing position paper. (Exh. 29) The Appellant returned the Response to

---

[1] Exhibiting starts at number 21 due to limited tab stock inventory.

Appellant Paid Medicare
Beneficiary

Notice of Hearing and signed Waiver of Ten Day Notice. (Exh. 30). On July 22, 2013, the undersigned ALJ held a telephone hearing in Irvine, California. (Exh. 31). Recording. Michael Tucker represented and testified on behalf of the Appellant. Id. All the Exhibits were admitted into evidence without objection. Id.

The ALJ finds that the Durable Medical Equipment (DME) provided to the Beneficiary by the Appellant is reimbursable under Medicare Part B pursuant to Title XVIII, Section 1862(a)(1), of the Act.

<u>Issues</u>

The issues before the undersigned Administrative Law Judge are:

Whether the Appellant is entitled to payment under Title XVIII of the Social Security Act ("Act") for the Durable Medical Equipment (Tilt-in-Space manual wheelchair and accessories) provided by the Calif. Medicare ____ on October 5, 2011, pursuant to Section 1862(a)(1) of the Social Security Act and C.F.R. 411.15(k)(1), and in accordance with Medicare guidance and National Coverage Determinations (NCD) 280.1 and 280.3.

If so, whether the Appellant should be excused from any outstanding liability pursuant to Section 1879 and 42 C.F.R. § 411.405 of the Act, if denial of payment is based on lack of medical necessity under Section 1862(a) of the Act.

<u>Findings of Fact</u>

The record establishes the following facts by a preponderance of the evidence:

1. The Appellant submitted claims to Medicare for a Tilt-in-Space wheelchair and accessories provided to the Beneficiary on October 5, 2011. (Exh. 21, 24, 27).

2. On January 25, 2012, the Medicare Contractor denied the claims on redetermination because the documentation submitted did not support the need for a Tilt-in-Space wheelchair, specifically because the Beneficiary was living in a skilled nursing facility. (Exh. 13). The Appellant was held liable. Id.

3. The QIC, in its decision dated April 17, 2012, upheld the denial of payment because there was insufficient evidence that an objective assessment of Beneficiary's health was evidenced in the medical records to support the need for a Tilt-in-Space wheelchair. (Exh. 20).

4. On October 5, 2011, the Beneficiary was a 91 year 9 month old female who lived in the custodial care section of a skilled nursing home. (Exh. 21, 24, 27). The Beneficiary caregivers, custodial care SNF, Social Services Director and Doctor had complaints about her mobility needs and lack thereof rendering her bedbound from degenerative joint

disease. (Id.) She had osteoporosis and Sjogren's syndrome, a chronic autoimmune disease in which her white blood cells would attack moisture-producing glands causing symptoms to include arthritis. (Id.) Her medical history also included a Total Knee Replacement (TKR) and multiple knee and ankle fractures. (Id.) In addition she had degenerative Aphasia, a brain and nervous system disorder that causes cognitive skill decline along with Peripheral Neuropathy. (Id.) The Beneficiary was unable to ambulate or stand for any length of time with documented history of multiple falls. (Id.)

5. The May 6, 2010, Medicare Eligibility Detail Inquiry form and Beneficiary Eligibility Information screens confirmed this date was the last billing date for her SNF skilled nursing care. (Exh. 27) She was down coded to custodial care and moved to another part of the facility. (Id.)

6. The May 11, 2010, Occupational Therapy Initial Evaluation form and Discharge Summary form were both signed by Dr. Gerard. (Exh. 21, 24, 27) It documented her physical limitations due to her history of end of life osteoporosis complicated with degenerative joint disease, peripheral neuropathy, and the auto immune disease Sjogren's disease. (Id.)

7. On March 16, 2011, a History and Physical report was completed, documenting in a face-to-face examination the Beneficiary's present illness and pertinent past history. (Exh. 21, 24, 27) Her primary diagnosis was listed as "chronic aphasia" in addition to "HTN" and "hip arthroplasty" with an emphasis that she did not have the mental capacity to understand or make decisions requiring "attendant care." (Id.)

8. On October 2, 2011 and August 21, 2011, the Beneficiary was seen by Dr. Gerard, the ordering physician for the Tilt-in-Space wheelchair that was delivered on October 5, 2011. (Exh. 21, 24, 27)

9. On October 4, 2011, a patient chart note by Susan Ray, the Social Services Director in charge of SNF, decided that the Beneficiary required a manual Tilt-in-Space wheelchair with custom seating and back supports. (Exh. 21, 24, 27) The purpose of the Tilt-in-Space wheelchair was to decrease pressure wounds and ulcers from sitting in one position for too long. (Id.) It was estimated she would be spending up to 10 hours daily in the wheelchair, and required the Tilt-in-Space type to improve respiration, digestion, and provide comfort and safety. (Id.) It was also to have elevating leg rests and adjustable height armrests for safe and easy transfers. (Id.) The ICD-9 codes were listed as 715.90[1], 933.00[2], and 401.9[3].

10. The October 4, 2011, Plan of Treatment was signed by the Physical Therapist and the Doctor. (Exh. 21, 24, 27) It gives an assessment rating to her limited capabilities shown as lacking progress under her primary diagnosis codes. (Id.)

---

[1] ICD-9-CM Diagnosis Code 715.90 Osteoarthritis unspecified whether generalized or localized involving unspecified site
[2] ICD-9-CM Diagnosis Code 733.00 Other disorders of bone and cartilage
[3] ICD-9-CM Diagnosis Code 401.9 Unspecified essential hypertension